KAREN W. COOPER, PLAINTIFF-APPELLANT, v. NORTON J. COOPER, DEFENDANT-RESPONDENT.

Argued April 3, 1984—Decided November 14, 1984.

44

*Louise M. Samaroo* (now *Robichaud*) argued the cause for appellant (*Smith, Lambert, Hicks and Miller,* attorneys).

*Lawrence E. Popp* argued the cause for respondent (*McLaughlin & Cooper,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal concerns *N.J.S.A.* 9:2–2, which provides in pertinent part that the custodial parent shall not remove minor children from this jurisdiction "without the consent of *both* parents, unless the court, upon *cause shown* shall otherwise order." (emphasis added). Specifically, the issue is what constitutes an adequate showing of "cause" for a court to allow

the custodial parent to remove the children from New Jersey over the noncustodial parent's objection.

## I

The parties, Karen W. Cooper (Karen) and Norton J. Cooper (Norton), were married in 1970, separated in 1977, and divorced in 1980. Two children were born of their marriage, Toby Cooper, born December 8, 1974, and Robert James Cooper, born August 3, 1976. Karen was granted custody of the children. An agreement between the parties, incorporated in the divorce judgment, provides, "HUSBAND shall have reasonable visitation with said children" and "[i]n the event that she wishes to change her residence, she agrees to obtain the consent of HUSBAND or a court of competent jurisdiction to said move and to make arrangements to assure that HUSBAND has appropriate visitation of the children."

In accordance with the terms of the Settlement Agreement, Karen in 1982 filed a Notice of Motion for modification of the Final Judgment of Divorce, seeking the court's permission to remove the children from New Jersey and take them to the San Diego area of California. Norton cross-moved for an order enjoining Karen from removing the children from New Jersey. A hearing was held on Karen's motion as well as Norton's cross-motion.

The first reason Karen gave for her desire to move concerns her belief that since the children were prone to colds, ear infections, and other respiratory problems, southern California would be a healthier climate for the children than New Jersey. Although she presented no evidence that the boys suffer from any significant respiratory problems, she was convinced that California would provide a healthier environment. Karen also presented evidence that the quality of life for the children would be at least equal to and perhaps better than that offered in Princeton since their housing, schooling, and activities would be comparable, and possibly enhanced by an improved climate.

Both children indicated to the trial court that they have friends in the Princeton area and at school, but did not indicate any great enthusiasm for either, nor did they indicate a preference for Princeton over California. Both parents agreed that the children were doing well in school and were well adjusted. Norton agreed that Karen and her mother were doing a splendid job in raising the children. Karen's mother, who has resided with her for approximately four-and-one-half years, would continue to live with her and the children in California.

The second reason Karen gave for wanting to move concerns a business opportunity in California. Karen has been offered a job working for a distributor of Mountain Valley Spring Water. The job is based on a trial period. If Karen successfully completes the trial period, she will enter into a partnership with the present San Diego distributor. This partnership would eventually result in her own distributorship and a good income.

In her affidavit in support of her motion for modification of the Divorce Decree, Karen also claimed that she was dating a man in the La Jolla, California area who wished to marry her. However, she wanted to know him better to be certain that she wished to marry him. Despite the reliance on this point by our concurring colleague, this issue was not pursued by either party nor considered by either of the courts below as a factor to be weighed in determining whether Karen should be allowed to move to California with the children.

Karen is 45 years old, has a fine arts degree from the University of Iowa, and last worked outside the home in 1973. Karen had made minimal and unsuccessful efforts to find employment and business opportunities in the Princeton area. Given her lack of business skills and experience, Karen found the franchise business an attractive employment opportunity because she could pursue it indefinitely and it was a relatively simple enterprise for which she did not need any specialized skills except selling.

Further, Karen testified that the children's relationship with their father would not be adversely affected by the move but might be improved because the children would be available to visit him 128 days per year, which compared favorably with the current visitation schedule. Karen calculated these days from the children's summer, spring, and Christmas vacations, and argued that extended periods of visitation might be better for the children than the present pattern of weekend visitation.

Norton presented no evidence contradicting Karen's claims as to the quality of life in California and her business opportunity. Instead, Norton opposed Karen's motion on the grounds that her reasons for moving were frivolous and that his Philadelphia-based business would not permit him to spend enough time in San Diego to carry on his previously close relationship with his sons.

Norton is a highly mobile businessman. He is president and majority stockholder of a liquor company with annual sales of approximately $80 million. Although his company's home office is in Philadelphia, he lives in an apartment in New York City, and his residence for voting and for "tax purposes" is Florida, where he has a hotel room. His company car is registered in Pennsylvania and he has a Florida driver's license. He travels constantly from Monday through Friday all year round, but visits his children on most weekends.[1] He travels to the west coast about three times a year, spending two or three days at a time there but not in the San Diego area.

Norton testified that he could not alter his business schedule, to make blocks of time available to accommodate his children, without making a significant financial sacrifice, adversely affecting the alimony and support that he would be able to pay Karen and the children. Finally, Norton claimed that he has a large, close-knit family in the Philadelphia area and that the

---

[1] It is undisputed that Norton visits the children approximately forty weekends per year.

boys benefit from contact with this family, especially their aunts and cousins.

The trial court ruled that Karen would be permitted to remove the children from Princeton, New Jersey to San Diego, California. The Appellate Division reversed the trial court and imposed the further restriction that Karen be prohibited from relocating or from removing the children beyond a 100-mile radius of New York City.

We granted Karen's petition for certification. 96 *N.J.* 294 (1984). We now reverse the judgment of the Appellate Division and remand to the trial court for a rehearing of the motion and a determination consistent with this opinion.

## II

*N.J.S.A.* 9:2–2 provides that children of divorced parents should not be removed from this jurisdiction without the consent of the noncustodial parent "unless the court, upon cause shown, shall otherwise order." *N.J.S.A.* 9:2–2; [2] *see Helentjaris v. Sudano,* 194 *N.J.Super.* 220 (App.Div.1984); *Middlekauff v. Middlekauff,* 161 *N.J.Super.* 84 (App.Div.1978); *D'Onofrio v. D'Onofrio,* 144 *N.J.Super.* 200 (Ch.Div.), aff'd *o.b.,* 144 *N.J.Super.* 352 (App.Div.1976).

The predecessor of the present statute was enacted in 1902 as part of general reform legislation dealing with the custody

---

[2] 9:2–2. Custody of children of divorced or separated parents within jurisdiction of Superior Court; removal from jurisdiction; consent; security

When the Superior Court has jurisdiction over the custody and maintenance of the minor children of parents divorced, separated or living separate, and such children are natives of this State, or have resided five years within its limits, they shall not be removed out of its jurisdiction against their own consent, if of suitable age to signify the same, nor while under that age without the consent of both parents, unless the court, upon cause shown, shall otherwise order. The court, upon application of any person in behalf of such minors, may require such security and issue such writs and processes as shall be deemed proper to effect the purposes of this section.

of children.[3]   Although there is no specific legislative history concerning the purpose of the statute, the cases decided under the 1902 statute support the conclusion that its purpose was to preserve the right of visitation between the noncustodial parent and the child after the custody award.  In *Dixon v. Dixon*, 72 *N.J. Eq.* 588 (Ch.1907), for example, the mother had been awarded custody of the children in New Jersey but the father had weekly visitation rights of which he regularly availed himself.  The mother moved the children to Maine without securing court approval.  The court held under the predecessor to *N.J.S.A.* 9:2–2 that:

> It does not appear that it would be for the welfare of the children that he [the father] should not continue to see and interest himself in them.  The strong presumption is that he should.  I think the mother ought not to deprive the father of the opportunity of seeing them at short intervals, as she would do if she could keep them permanently in Maine.  [*Id.* at 594.]

Since it was unclear whether the mother had moved to Maine permanently, the court ordered a new hearing on that point. *See also Francisco v. Francisco*, 73 *N.J.Eq.* 313, 317 (Ch.1907) (recognizing father's right to visit his children in this state).

The statutory language affirms that the purpose of the statute is to preserve the rights of the noncustodial parent and the child to maintain and develop their familial relationship. This mutual right of the child and the noncustodial parent to develop and maintain their familial relationship is usually achieved by means of visitation between them.  Because the removal of the child from the state may seriously affect the

---

[3]*L.*1902, *c.* 92, § 7, p. 259 provides

> 7.  When the court of chancery has jurisdiction over the custody and maintenance of the minor children of parents divorced, separated or living separate, and such children are natives of this state, or have resided five years within its limits, they shall not be removed out of its jurisdiction against their own consent, if of suitable age to signify the same, nor while under that age without the consent of both parents, unless the court, upon cause shown, shall otherwise order;  the court, upon application of any person in behalf of such minors, may require such security and issue such writs and processes as shall be deemed proper to effect the purposes of this and the preceding sections.

visitation rights of the noncustodial parent, the statute requires the custodial parent to show cause why the move should be permitted. Because the legislation and the cases are silent as to what kind of and how much cause must be shown, we must decide that issue today.

The courts of other states have considered the issue of removal but have differed on what constitutes sufficient cause for removal. Several of these states have anti-removal statutes similar to *N.J.S.A.* 9:2–2. See *Ill.Rev.Stat.* ch. 40, § 609 (1977); *Mass.Gen.Laws Ann.* ch. 208, § 30 (West 1981); *Minn.Stat.* § 518.175(3) (Supp.1981); and *S.D. Codified Laws Ann.* § 25–5–13 (1981).

In Minnesota, the custodial parent's right to remove a child from the jurisdiction is limited only by the court's power to restrain removal when it would prejudice the rights of the child. In *Auge v. Auge*, 334 *N.W.*2d 393 (Minn.1983), for example, the Minnesota Supreme Court held that a custodial parent's motion to remove a child from the jurisdiction should be granted unless the noncustodial parent established, by a preponderance of the evidence, that the move would not be in the best interests of the child. One reason that the Minnesota court took such a liberal stance on removal was that

> [i]n the past, removal was commonly denied because of the potential loss of jurisdiction over custody issues. This concern has largely been met by adoption in 44 states of the Uniform Child Custody Jurisdiction Act. *See, e.g.*, Minn.Stat. §§ 518A.01–.25 (1982). *See generally* Coombs, *Interstate Child Custody: Jurisdiction, Recognition, and Enforcement*, 66 *Minn.L.Rev.* 711 (1982). Further protection of the rights of both parents is afforded by the Parental Kidnapping Prevention Act of 1980, 28 U.S.C. § 1738A (Supp. V 1981).
> [*Id.* at 399.]

Other states allow the child to accompany the custodial parent whenever the custodian has a legitimate reason and the move is consistent with the best interests of the child. *See In re Marriage of Brady*, 115 *Ill.App.*3d 521, 71 *Ill.Dec.* 297, 450 *N.E.*2d 985 (App.Ct.1983) (custodial parent makes *prima facie* showing by demonstrating a desire to move, a sensible reason for the move, and "some showing that the move is in the best

interests of the child."); *Jafari v. Jafari*, 204 *Neb.* 622, 624, 284 *N.W.*2d 554, 555 (1979) ("The general rule in cases where a custodial parent wishes to leave the jurisdiction for any legitimate reason is that the minor children will be allowed to accompany the custodial parent if the court finds it to be in the best interests of the children to continue to live with that parent."); *In re Matter of Ehlen*, 303 *N.W.*2d 808, 810 (S.D. 1981) ("The majority of cases dealing with removal of a child from the jurisdiction support the rule that if a parent who has custody of a child has good reason for living in another state, removal will be permitted, providing such a move is consistent with the best interests of the child."); *see also Hutchins v. Hutchins*, 84 *Mich.App.* 236, 238, 269 *N.W.*2d 539, 540 (Ct.App. 1978) (decision whether to allow removal should be based on best interests of the child standard as mandated by *Mich.Comp.Laws* § 722.23).

In New York, on the other hand, "[d]isruption of the relationship between the noncustodial parent and the marital issue by relocation of the custodial parent in a distant jurisdiction will not be permitted unless a compelling showing of 'exceptional circumstances' * * * or a 'pressing concern' for the welfare of the custodial parent and child * * * is made warranting removal of the child to a distant locale." *Courten v. Courten*, 92 *A.D.*2d 579, 580, 459 *N.Y.S.*2d 464, 466 (App.Div.1983) (citations omitted).

The vast majority of states fall between Minnesota, which requires no showing of cause by the custodial parent if the noncustodial parent fails to present specific evidence that the move would not be in the child's best interest, and New York, which requires the custodial parent to show "exceptional circumstances" before removal should be approved. Most states, recognizing the sensitive and extraordinary importance of a decision affecting a parent-child relationship, attempt to balance the interests of the child in having fulfilling relationships with both parents, the custodial parent's right to settle wherever he or she pleases, and the right of the noncustodial parent to

maintain a relationship with his or her children through regular visitation. These determinations are not easily subjected to clear, bright-line tests but must be made on a case-by-case basis, depending, to a great extent, upon the circumstances of each case. *See Dozier v. Dozier*, 167 *Cal.App.*2d 714, 334 *P.*2d 957 (Dist.Ct.App.1959); *Bell v. Bell*, 112 *So.*2d 63 (Fla.Dist.Ct. App.1959); *Good v. Good*, 79 *Idaho* 119, 311 *P.*2d 756 (1957); *Hale v. Hale*, 12 *Mass.App.Ct.* 812, 429 *N.E.*2d 340 (1981).

### III

While this Court has not addressed the issue of when a court should allow removal of children from the state by the custodial parent, Judge Pressler's decision in *D'Onofrio, supra*, 144 *N.J.Super.* 200, is the leading case in this area. In both of the other New Jersey Appellate Division decisions interpreting *N.J. S.A.* 9:2–2, the courts have applied the standards set down in *D'Onofrio. See Helentjaris v. Sudano, supra*, 194 *N.J.Super.* 220; *Middlekauff v. Middlekauff, supra*, 161 *N.J.Super.* 84. In the present case both the trial court and the Appellate Division sought to apply the *D'Onofrio* standard but came to different conclusions based on their application of that standard to this case.

In *D'Onofrio* the court, in a thoughtful discussion, analyzed the considerations and the competing interests that must be weighed in a court's determination of whether removal should be permitted. Crucial to the *D'Onofrio* decision is the realization that after a divorce a child's subsequent relationship with both parents can never be the same as before the divorce when the family lived together. As stated in *Helentjaris, supra*, 194 *N.J.Super.* 220, "[t]he family unity which is lost as a consequence of the divorce is lost irrevocably, and there is no point in judicial insistence on maintaining a wholly unrealistic similation of unity." *Id.* at 229. The realities of the situation after divorce compel the realization that the child's quality of life and style of life are provided by the custodial parent. That the

interests of the child are closely interwoven with those of the custodial parent is consistent with psychological studies of children of divorced or separated parents. One researcher has concluded that

> [o]f all factors related to the child's way of coping with loss [of a parent because of divorce or death], the role of the home parent seemed most central. Some years after the divorce or death, the well-being of the child appeared closely related to the well-being of the [home] parent. [*L. Tessman, Children of Parting Parents* 516 (1978).]

Other investigators have found that there is an increased emotional dependence on the custodial parent after divorce and that children of all ages "were in trouble" when the home parent-child relationship was affected by stress on the home-parent, such as "loneliness and discouragement." *J. Wallerstein & J. Kelly, Surviving the Breakup* 114, 224–225 (1980).

■ Because the best interests of a child are so interwoven with the well-being of the custodial parent, the determination of the child's best interest requires that the interests of the custodial parent be taken into account. It is on this fundamental point that we disagree with the concurring opinion. We do not, as the concurrence alleges, equate the best interests of the child with the best interests of the custodial parent. We do maintain, however, that a determination of the best interests of the child requires taking into account the interests of the custodial parent. The concurrence's insistence that determination of a child's best interest should be made independent of, even if not exclusive of, the well-being of the custodial parent ignores the reality of life in the home of a single, divorced, custodial parent.

■ However, the custodial parent's well-being is not the only factor influencing the child's best interest in visitation cases. In suggesting that the standard we set fails to recognize a child's interest in maintaining his or her relationship with the noncustodial parent, the concurrence misreads our opinion. We emphasize throughout our opinion that the child has a strong interest in maintaining and developing a relationship

with a noncustodial parent. We emphasize that the purpose of the predecessor and present statutes was to preserve the rights of the noncustodial parent and the child to maintain and develop their relationship. And as we state later in this opinion, an important factor to be considered in an individual case is whether a realistic and reasonable visitation schedule can be reached that will provide an adequate basis for preserving and fostering a child's relationship with the noncustodial parent. There can be no question that in most cases the more contact children of divorced parents have with the noncustodial parent, the better their relationship with that parent will be. *See J. Wallerstein & J. Kelly, Surviving the Breakup* 194, 307–311 (1980) (suggesting that psychological well-being of a child is influenced by continuing contact with both parents).

In a perfect world, every child would live in a loving, two-parent home. Unfortunately, we do not live in such a world. When parents are divorced or separated, the family unit, even from the perspective of the child, is broken. The parents no longer live in harmony but have competing and often irreconcilable interests. Therefore, it is essential that the courts look to the facts of each case to determine which interests should be given the most weight. It is the court's task to attempt to accommodate the interests of both parents while serving the best interests of the child. In weighing the factors, however, the court should be mindful that after the divorce a noncustodial parent is free to remove himself or herself from this state to seek a better or different lifestyle despite the continued residency here of the children. If a noncustodial parent chooses to leave this state, or to alter his or her personal life style, the custodial parent cannot prevent his or her departure or change in life style even though it may severely disrupt the child's relationship with that parent. The custodial parent who bears the burden and responsibility for the child is entitled, to the greatest possible extent, to the same freedom to seek a better life for herself or himself and the children as enjoyed by the noncustodial parent. *D'Onofrio,*

*supra,* 144 *N.J.Super.* at 207. The custodial parent's freedom to move is qualified, however, by the special obligation of custody, by the state's interest in protecting the best interests of the child, and by the competing interest of the noncustodial parent.

██ When removal is challenged under *N.J.S.A.* 9:2–2, we hold that to establish sufficient cause for the removal, the custodial parent initially must show that there is a real advantage to that parent in the move and that the move is not inimical to the best interests of the children.[4] Removal should not be allowed for a frivolous reason. The advantage, however, need not be a substantial advantage but one based on a sincere and genuine desire of the custodial parent to move and a sensible good faith reason for the move. To establish that the move is not inimical to the best interests of the children, the moving party must show that no detriment to the children will result from the move. For example, if a child were attending a special education program or receiving medical care which was not available in a comparable form in the area where the custodial party wished to move, or if a child had a medical problem which would be aggravated by the move, the threshold requirement would not be met. The decision as to whether the moving party has met the threshold requirement does not include consideration of the visitation issue. It is only after the custodial parent establishes these threshold requirements that the court should consider, based on evidence presented by both parties, visitation and other factors to determine whether the custodial parent has sufficient cause to permit removal under the statute.

██ The first factor to be considered is the prospective advantages of the move in terms of its likely capacity for either maintaining or improving the general quality of life of both the

---

[4]Despite the erroneous statement in the concurrence, at 69, *N.J.S.A.* 9:2–2 is not applicable if both parents consent to the children's removal.

custodial parent and the children. The second factor is the integrity of both the custodial parent's motives in seeking to move and the noncustodial parent's motives in seeking to restrain such a move (*e.g.*, whether the custodial parent is motivated by a desire to defeat and frustrate the noncustodial parent's visitation rights and remove himself or herself from future visitation orders or whether the noncustodial parent is contesting the move mainly to impede the custodial parent's plans or to secure a financial advantage with respect to future support payments). And the third factor is whether, under the facts of the individual case, a realistic and reasonable visitation schedule can be reached if the move is allowed. In a given case, evidence of any of these factors may be used to militate against either the threshold showing of the custodial parent for removal, or the arguments of the noncustodial parent against removal.

■ A realistic and reasonable visitation schedule is one that will provide an adequate basis for preserving and fostering a child's relationship with the noncustodial parent if the removal is allowed. When there has been a pattern of weekend visitation, "a court should be loath to interfere with it by permitting removal of the children for frivolous or unpersuasive or inadequate reasons." *D'Onofrio, supra,* 144 *N.J.Super.* at 206 (citing *Grove v. Grove,* 26 *N.J.Super.* 154 (App.Div.1953)). Such a pattern establishes the noncustodial's parent's interest in maintaining a good relationship with the child. Nevertheless,

> [t]he court should not insist that the advantages of the move be sacrificed and the opportunity for a better and more comfortable life style for the mother and children be forfeited solely to maintain weekly visitation by the father where reasonable alternative visitation is available and where the advantages of the move are substantial. [*Id.* at 207.]

■ Since the noncustodial parent has the necessary information to demonstrate that an alternative visitation schedule is not feasible because of distance, time, or financial restraints, we place the burden on that parent to come forward with evidence

that a proposed alternative visitation schedule would be impossible or so burdensome as to affect unreasonably and adversely his or her right to preserve his or her relationship with the child. We emphasize that more than a showing of inconvenience by the noncustodial parent is required to overcome a custodial parent's right to remove the children after he or she has met the threshold showing that the move would be a real advantage to him or her and would not be inimical to the best interests of the children. If, however, the noncustodial parent does present evidence that his or her relationship and visitation with the children would be adversely affected by the move, then the trial court must balance the competing interests of the parties.

The more evidence there is that the noncustodial parent's visitation with the children will be adversely affected, the more of a showing of compelling reasons to move must be made by the custodial parent. If it is shown that a noncustodial parent's visitation would be adversely changed or curtailed by the move, the court should require a very substantial or compelling showing of advantage by the custodial parent before allowing the move. We reiterate that the burden of proof is on the custodial parent to meet the threshold requirement. Once the custodial parent has met that threshold, the decision of the court will be based on a balancing of the evidence, presented by both parties, relating to the factors outlined above. Because they are fact-sensitive, no two cases are the same and it is therefore essential that the trial court have the flexibility to deal with unforeseen fact patterns.

## IV

In conclusion, we reverse and remand this case to the trial court to decide in accordance with the standards we set forth today.

■ Since we recognize that the circumstances of the parties have changed in the year that has elapsed since the original

hearing on this motion, on remand both parties may supplement the record with any information that may be pertinent to the trial judge's determination of this case.

Further, at the new hearing both parties will have an opportunity to present expert testimony as to the benefits of weekly visitation as opposed to longer block term visitation. We do not mean to imply that expert testimony is required but merely that the parties, if they so desire, may present such evidence. We express no opinion as to which form of visitation is more beneficial. We suspect that as with most custody and visitation issues the best method in each case depends to a great extent on the specific facts of that case.

SCHREIBER, J., concurring.

The question in this case is whether a divorced mother who has custody of her two sons, now ages eight and ten, has shown that the boys' best interests will be served by moving them 3000 miles from their father, who visits them almost every weekend. The mother's justifications for changing her children's and her home from Princeton, New Jersey, to California are: (1) to make it more convenient for her to meet with a male companion who lives in California and is interested in marrying her; (2) to permit her to try out a possible new business venture; and (3) to give her and her sons the benefit of the warmer climate in Southern California.

The boys' father objects to the childrens' removal. He asserts that his former wife has not met the burden of demonstrating good cause for the move. "Good cause" is a statutory requirement that has hitherto been equated with a showing that the move will be in the best interests of the children. The father also contends that having his sons with him for blocks of time during school vacations, rather than every weekend, will drastically reduce the amount of time he spends with them, since his business—a business that has provided the sole sup-

port for his wife and sons at $50,000 a year—requires him to travel during the week.

In this setting the majority dilutes the burden of persuasion, which until now has been placed on the plaintiff when custody has been awarded to a parent in this state, in accordance with the statute governing removal of children from this state. *N.J.S.A.* 9:2–2. The majority also interprets "good cause," the statutory basis for permitting removal from New Jersey, in a fashion that emphasizes the interests of the custodial parent rather than focusing on the best interests of the children. It should also be observed that the trial court's analysis was predicated on the erroneous basic assumption in *D'Onofrio v. D'Onofrio*, 144 *N.J.Super.* 200 (Ch.Div.), aff'd o.b., 144 *N.J.Super.* 352 (App.Div.1976), that the family unit, after a divorce, consists *only* of the custodial parent and the children, and that what is best for the new family unit and its members is necessarily best for the children. Although the majority does not expressly adopt this position, it approaches that proposition by projecting as an essential "first factor" to be considered "maintaining or improving the general quality of life of both the custodial parent and the children." *Ante* at 56–57.

I would remand the matter to the trial court to reexamine the record, as supplemented by the parties, to determine whether the proposed move to California is in the best interests of the children. The majority's improper focus on the desires of the custodial parent and its misallocation and treatment of the burden of proof impel me to write separately.

## I

Plaintiff, Karen W. Cooper, and defendant, Norton J. Cooper, were married on February 14, 1970. Two sons were born of the marriage: Toby, born December 8, 1974, and Robert James, born August 3, 1976.

The parties separated in 1977, and plaintiff filed a complaint for divorce in April, 1977. A settlement agreement was en-

tered into on October 6, 1977. The settlement agreement, with some modifications involving the amounts of Mrs. Cooper's and the children's support, was incorporated into the judgment of divorce in September, 1980.

The settlement agreement provided that Mrs. Cooper would have custody of the two boys, and that Mr. Cooper would have "reasonable visitation" with them. The marital home in Princeton, New Jersey, was deeded to plaintiff as part of the equitable distribution. Mrs. Cooper, her two sons, and her mother continued to live in the Princeton home after the divorce. The agreement provided that if Mrs. Cooper wished to change her residence, she would have to obtain the consent of defendant or of a court of competent jurisdiction "to said move and to make arrangements to assure that [the defendant] has appropriate visitation of the children."

Shortly after the agreement was signed and while the divorce proceedings were pending, Mrs. Cooper restricted defendant's visitation so that he could be with his sons only in the Princeton home and while his mother-in-law was present. Mr. Cooper thereafter moved to make his visitation less restrictive, and the court ordered that he could have custody of his sons on alternate Saturdays and Sundays between 10:00 a.m. and 7:00 p.m. and one weekend per month from Saturday at 10:00 a.m. until Sunday at 7:00 p.m. Mr. Cooper exercised his visitation rights faithfully since that time, visiting with his sons about forty weekends a year.

Mr. Cooper's mother and sisters and their families resided in the Philadelphia area. On occasion, particularly on Jewish holidays, his sons and he would visit with them. Mr. Cooper wanted his sons to have an appreciation of Jewish tradition, which was made possible on these occasions. The parties had agreed when they were married to raise their sons in the Jewish faith, and Mrs. Cooper had no objection to this religious influence.

Mr. Cooper is president of a wholesale liquor business that has its principal office in Philadelphia. The business also has a distillery in Florida and a bottling operation in France. Mr. Cooper's job requires him to travel constantly, so that during the week he is rarely at home. However, he has consistently arranged his schedule to be at home on weekends to spend time with his children. This arrangement existed throughout his married life. Defendant testified that his "priorities are two-fold: [m]y children and my business."

Since the birth of their first child, plaintiff has not been employed and defendant has maintained and supported her. Mr. Cooper has also supported his two sons, who attended a private school in Princeton at the time of the trial. He estimated that he was spending about $50,000 per year on behalf of his former wife and children at that time. His annual salary was then $110,000.

At the time of the hearing, Mrs. Cooper was forty-five years old. She was a college graduate and had worked as a model, but had not been employed since 1973. Sometime after her divorce, she became interested in obtaining a franchise to distribute Mountain Valley Spring Water. In 1981, upon being informed that the Princeton-area franchise was already taken, she investigated the possibility of a franchise in Tucson, Arizona, but thought it would be too much for her to handle alone. She then investigated a possibility in San Diego, California. The owner was interested in hiring Mrs. Cooper as a salesperson, and possibly allowing her to become a partner in the business some time later, if he determined, after seeing how he and Mrs. Cooper worked together, that such a relationship would be profitable to him. Other than speaking to friends and making a single visit to a temporary employment agency in Princeton about 1979, Mrs. Cooper had made no other efforts to seek employment or to acquire a business near home.

It was in this context that Mrs. Cooper sought court approval to move to California with the children. In her affidavit at-

tached to the moving papers she asserted three reasons for the proposed move. First, she stated that she had "been seeing a man who lives near La Jolla, California. * * * He wants to marry me and I believe that I want to marry him, but because we live on opposite Coasts it has been difficult to pursue our relationship to the point where we are both absolutely sure that we want to get married." [1]

The second reason she gave for the move was that she believed the warmer climate in La Jolla, California, would be beneficial for the children's health. She also had investigated a private school there that she found comparable to the schools in Princeton.

Her third reason was the possibility of her purchasing an interest there in the bottled-water distributorship. As noted above, she proposed to work with a distributor in La Jolla, but she would not be given an opportunity to buy an interest in the business unless the trial period was satisfactory.

In anticipation of a favorable court order, Mrs. Cooper sold the Princeton home for $330,000. She is still owed $57,695 of the purchase price (the amount of the first mortgage on the home, which defendant is obligated to pay). Upon the sale of the home, plaintiff, her mother, and her sons moved into a motel near Princeton.

Mrs. Cooper testified that even if she moved the children to California, the California school calendar was such that the boys would be able to be with their father during school vacations, particularly summers, totaling 128 days a year. She also contended that Mr. Cooper could visit his sons when he

---

[1] The majority seems to indicate that this fact should be ignored because it was not considered by either of the courts below. *Ante* at 47. It is unclear whether either court considered the fact. However, the trial court should have weighed this factor, among others, in view of its responsibility to determine and promote the best interests of the children. In response to the majority's implication, I note that this is not simply an adversarial proceeding between private parties; it also involves the state's interests as *parens patriae*.

was in California. Mr. Cooper testified, however, that his travel schedule was such that if he were to have the boys with him for block periods, he would be able to see them on only one third of the weekends during the year instead of on weekends throughout the year. He also said that his California trips were on business, and, in any event, were not in Southern California, so that realistically they offered him little opportunity for visitation with his sons. The trial court, in separate interviews with the two children, did not directly ask either of them whether he preferred the existing visitation arrangement or one in which he would spend his summers and other vacation periods with his father.

Plaintiff's motion for removal to California was consolidated with defendant's motion to take his two sons with him on a business trip to Europe for three weeks during the 1983 summer. The trial court permitted this trip over Mrs. Cooper's objection.

On plaintiff's motion the trial court ruled that she could move with the children to California. Although it was convinced that both parents were "bona fide," the trial court found that a large block of visitation time "would be better for the children and for the father." The court acknowledged that it had not "specifically [gotten] into that area" in its discussions with the two boys. The trial court stated, however, that "it would be an improved relationship between the father and the benefit to the boys for being able to spend more consecutive time with them and so that is a positive factor in favor of the plaintiff as well." The trial court also believed that plaintiff "should get employment," that "[i]t would be good for her and will add to her income." The court did not take a position on whether the boys' health would improve as a result of the California weather.

The Appellate Division reversed in an unpublished opinion. It observed that the children were not suffering from any respiratory problems in New Jersey and that they were well-ad-

justed there and doing well in school. It concluded that "[a]ny benefits to the children from a move to California are minimal at best." As for the alleged benefits of the move for Mrs. Cooper, it noted that the San Diego business opportunity was highly speculative, based, as it was, on a trial period, and that Mrs. Cooper had made little effort to find similar job opportunities in the Princeton area. Although acknowledging that a custodial parent should have a right to move to other locales, the Appellate Division held that that right was subordinate to the children's right to continued visitation with their noncustodial parent. The Appellate Division pointed out that the nature of the defendant's business, which had "enabled the family to enjoy a very high standard of living," required his constant travel during the week, so that as a practical matter he could see the children only on weekends during most of the year. The Appellate Division, after having "carefully examined the transcript of the testimony," was satisfied "that the trial court reached conclusions that [were] not supported by the evidence" before it. It reversed and directed entry of an order denying plaintiff's application.

## II

The settlement agreement that the parties made and that was incorporated in the divorce judgment provided that if the plaintiff

> wishes to change her residence, she agrees to obtain the consent of Husband or a court of competent jurisdiction to said move and to make arrangements to assure that Husband has appropriate visitation of the children.

Two elements of this provision are significant. First, the provision restricted moves even within New Jersey, for it prevented the wife from changing her residence, which was in Princeton. Thus, the parties acknowledged there was something special about the mother's *residence in Princeton*. Second, the provision recognized the importance of defendant's visitation rights with his children. The provision was probably inserted because defendant's employment required constant

travel during the week, a situation that had existed throughout the Coopers' married life, and because the location of the marital home was between defendant's principal office in Philadelphia and his New York home.

Substantial deference is to be accorded to parents' mutually-agreed-upon decisions with respect to custody and visitation. *Cf. Petersen v. Petersen,* 85 *N.J.* 638, 642 (1981) (alimony and support agreements "are essentially consensual and voluntary in character and therefore entitled to considerable weight * * * notwithstanding the fact that such an agreement has been incorporated in a judgment of divorce"); *Lepis v. Lepis,* 83 *N.J.* 139, 154 (1980) (support agreements are "more carefully tailored to the peculiar circumstances of the parties' lives" than court orders); *Smith v. Smith,* 72 *N.J.* 350, 358 (1977) (property settlement agreements that represent "fair and definitive arrangements arrived at by mutual consent should not be unnecessarily or lightly disturbed"). Parents are probably in the best position to know the preferred arrangement for their children. In the absence of unusual circumstances, courts should be guided by a consensual position concerning custody and visitation. They should also be guided by the parents' agreement regarding the physical situs of the children, for ι e children's geographical location can affect visitation with the noncustodial parent.

However, the parties' agreement is not conclusive. Although the parents certainly have a strong interest in determining the future of their children, the state's *parens patriae* authority permits it to override parents' decisions for their children when necessary to protect the children's interests. The touchstone of custody and visitation rights (which includes the physical location of the children) is the best interests of the children. *See Sheehan v. Sheehan,* 38 *N.J.Super.* 120, 126–27 (parents' agreement authorizing removal of children to Maryland was not "sole determinant" since court judgment must be grounded on the "best interests" of the children), modified after remand, 51 *N.J.Super.* 276 (App.Div.1958).

Legislative policy favors keeping children whose domicile is in this state within New Jersey. *N.J.S.A.* 9:2–4, which deals with the initial designation of a custodial parent in cases involving custody disputes between their parents, expresses a legislative policy not to grant custody to a parent who will take the children to another state. It provides:

[I]n no case shall the court having jurisdiction in this State over the person and custody of any minor permit such child to be removed from this State where the mother or father resides in this State and is the suitable person who should have the custody of such child for its best welfare.

When custody has been awarded to a parent in this state, the Legislature has decreed in *N.J.S.A.* 9:2–2 that the children

shall not be removed out of [this] jurisdiction against their own consent, if of suitable age to signify the same, nor while under that age *without the consent of both parents,* unless the court, *upon cause shown,* shall otherwise order. [Emphasis added.]

This statute clearly places the burden of showing cause on the parent seeking to remove the children from the state.

This legislation supplements the *parens patriae* jurisdiction of the court. *Fantony v. Fantony,* 21 *N.J.* 525, 535 (1956); Silverman, "Marriage, Divorce, Separation," 11 *New Jersey Practice* 538 (4th ed. 1981). Judge Conford, writing in *Casteel v. Casteel,* 45 *N.J.Super.* 338 (App.Div.1957), reminds us:

Section 9:2–2 evinces a strong policy predilection for keeping minor native residents of this State of tender years, children of divorced or separated parents, from being removed from the jurisdiction without the consent of both parents. [*Id.* at 353.]

In removal cases, as in cases dealing with child custody, the key question is the best interests of the child. When a New Jersey divorce decree concerns parties who reside in New Jersey with their children, who have been born and raised in this state, the custodial parent generally may not remove the children in the absence of a showing that the best interests of the children warrant that removal. *See Grove v. Grove,* 26 *N.J.Super.* 154, 156–57 (App.Div.1953). "Only if the court is satisfied that the best interests of the child call for it may such removal take place." *Casteel v. Casteel, supra,* 45 *N.J.Super.* at 353.

Because of the children's interests in maintaining significant contact with both parents following the parents' divorce, it has long been recognized that removal of a child to another jurisdiction ordinarily should not be granted if it will have an adverse impact on the right of visitation. In *Feinberg v. Feinberg*, 72 *N.J.Eq.* 810 (Ch.1907), the trial court refused to permit the mother to remove minor children to Pittsburgh over the father's objection. The court stated:

> It is manifest in this cause it would be destructive of the right of visitation to make an order permitting the custody of the minor to be maintained in [Pittsburgh] * * *. [*Id.* at 811.]

Judge Kole, writing then as a judge of the Juvenile and Domestic Relations Court, stated the general rule in *Daly v. Daly*, 39 *N.J.Super.* 117 (Juv. & Dom.Rel.), aff'd, 21 *N.J.* 599 (1956):

> The policy of the law of this State against the thwarting of effective visitation rights is evident from our statutes which, generally, prohibit one parent from removing the children from this State and restrain the awarding of custody to a parent who will take the children to another state, except where the welfare of the children dictates otherwise. [*Id.* at 123–24.]

Thus, in determining whether "cause" for removal has been shown, analysis should initially focus on the best interests of the children. Generally the resolution of that issue will decide the question. It is self-evident that the well-being of *both* parents may be relevant factors in determining what is in the best interests of the children. It is primarily in that respect that the well-being of the parents, both custodial and noncustodial, should be considered. The majority's notion that this concurrence insists that "determination of a child's best interest should be made independent of, even if not exclusive of, the well-being of the custodial parent," *ante* at 54, it is respectfully submitted, is a misunderstanding of the position advocated herein. Obviously the best interests of a child may be intertwined with the well-being of the custodial parent.

If the best interests of the children would be unaffected by a move to another jurisdiction, the custodial parent should be free to move. For example, if the custodial parent desires to move

to another jurisdiction, the noncustodial parent, though not consenting to the request,[2] does not seek and exercise visitation, and the move would not otherwise harm the children, the custodial parent's desire in and of itself should be sufficient cause for the move, irrespective of that parent's motives. The majority, on the other hand, would deny the custodial parent the permission to move in that situation, despite the fact that the best interests of the children would not be adversely affected, so that the noncustodial parent, having little, if any, interest in the children, could move freely about, while the custodial parent would have to remain in New Jersey. In this sense, the majority restricts the custodial parent's freedom of movement far more than necessary to protect the best interests of the children.

### III

Determining what is in the best interests of children requires an evaluation of intricate, complex, and sensitive matters arising out of the single-parent home. In 1980 there were approximately twelve million children living in a single-parent environment. "One-Parent Families and Their Children: The School's Most Significant Minority (An NAESP Staff Report)," 60(1) *Principal* 31 (1980) [hereinafter cited as "The School's Most Significant Minority"]. About ninety percent of those children resided with their mothers. *Id.* at 32. It has been estimated that four out of ten children born in the 1970's will live in single-parent homes, many as the result of the separation or divorce of their parents. Bloom-Feshbach, "Historical Perspectives on the Father's Role," in *The Role of the Father in Child Development* 97 (M. Lamb ed. 2d ed. 1981) [hereinafter cited as *M. Lamb*]. Another important factor is the growth in the

---

[2]*N.J.S.A.* 9:2–2, contrary to the majority's position, *ante* at 56, must be satisfied in the absence of consent of the noncustodial parent. Thus, a nonconsenting parent who either objects to or does not affirmatively consent to the children's removal would trigger the operation of the statute.

number of mothers in the work force. In 1940, 8.6% of the mothers were employed; in 1978, the percentage had risen to 53%. *Id.*

The children's ties to the parents after a divorce may take a variety of forms. The parents may have joint custody of the children. *Beck v. Beck*, 86 *N.J.* 480 (1981). The sole custodial parent may become employed and have less contact with them, thereby emphasizing the importance to the children of visitation by the noncustodial parent. The noncustodial parent may exercise visitation rights that include some physical custody, such as overnight stays. Or the noncustodial parent may drift completely away from the children.

The last scenario, unfortunately, is one of the most common. Following a divorce in which custody is awarded to one parent, the noncustodial parent, usually the father, often fades out of his children's lives. As one mental health guidebook states:

> Although access to the noncustodial parent is healthy for children, it is not as widely available as might be expected. In a study of 560 divorced parents, Fulton (1979) found that only one custodial parent in five reported a steady pattern of visitation by the noncustodial parent; 44% reported a tapering off of visitation, 6% reported once or twice a year visiting, and 28% reported that there was no visitation at all. Almost 40% of the custodial mothers admitted to actively preventing access to the children for reasons that were punitive in nature. [*D. Cantor & E. Drake, Divorced Parents and Their Children: A Guide for Mental Health Professionals* 109 (1983) (citing Fulton, "Parental Report of Children's Post-Divorce Adjustment," 35(4) *J. Soc. Issues* 126–39 (1979)).]

One study of thirty families found that the average time that fathers spent in the presence of their children decreased markedly following the parents' separation, from 53.6 hours for a two-week period prior to separation to 20.12 hours after the separation. Jacobson, "The Impact of Marital Separation/Divorce on Children: Parent/Child Separation and Child Adjustment," 1(4) *J. Divorce* 341–60 (1978), *cited in D. Cantor & E. Drake, supra,* at 109.

However, children continue to have an interest in maintaining a close and abiding relationship with both their parents following a divorce. Researchers have found that a large majority of

children whose parents have divorced yearn for their absent parent with surprising persistence and passion. Wallerstein and Kelly, in one of the most complete, long-term studies of children of divorced parents, found that children expressed the wish for increased contact with the noncustodial parent, usually the father, "with a startling and moving intensity," that they found twice-monthly weekend visits woefully inadequate, and that "[t]he intense longing for greater contact persisted undiminished over many years." *J. Wallerstein & J. Kelly, Surviving the Breakup: How Children and Parents Cope with Divorce* 134 (1980); *accord* Warshak & Santrock, "The Impact of Divorce in Father-Custody and Mother-Custody Homes: The Child's Perspective," in *Children and Divorce* 41 (L. Kurdek ed. 1983) (62% of children surveyed felt that their visits with their father were too infrequent); *see also* Rosen, "Some Crucial Issues Concerning Children of Divorce," 3(1) *J. Divorce* 19–26 (1979), cited in *D. Cantor & E. Drake, supra,* at 109 (69% of ninety-six children surveyed would have chosen free access to the noncustodial parent). Wallerstein and Kelly placed "continuity with both parents" first in their list of factors contributing to a child's successful adjustment to a divorce. *J. Wallerstein & J. Kelly, supra,* at 215. Other psychological and sociological studies have similarly pointed to a continued, significant relationship with both parents as critical to a child's development. *See, e.g.,* Machtlinger, "The Father in Psychoanalytic Theory," in *M. Lamb, supra,* at 147 (stating that psychoanalysts consider the presence of *both* parents essential in promoting healthy personality growth). It follows that regular visitation by the noncustodial parent is generally in the best interests of the children and that creating circumstances that will reduce such visitation is probably not in their best interests.

Usually, custody of children of tender years following divorce is granted to the mother if she is fit and proper. Silverman, "Marriage, Divorce, Separation," 11 *N.J. Practice* 508 (4th ed. 1981). Continuing contact with the father in such situations is

critical to the children's emotional and cognitive development. Professor M.E. Lamb, in an essay on the role of the father in child development, has stated:

> The absence of a primary socializing agent (usually the father) is likely to have direct effects on the child as well as indirect effects mediated by the emotionally and economically strained * * * and socially isolated * * * single parent. [Lamb, "Fathers and Child Development: An Integrative Overview," in *M. Lamb, supra,* at 30–31.]

Fathers may be as sensitive and as concerned with the child-rearing process as mothers. Lewis, Feiring & Weinraub, "The Father as a Member of the Child's Social Network," in *M. Lamb, supra,* at 275. Professor Biller has written that "the quality of fathering that the boy receives is generally the most crucial factor in the positive development of his view of himself as a male." Biller, "The Father and Sex Role Development," in *M. Lamb, supra,* at 323. Studies have revealed that a father's absence from his son noticeably impedes the child's academic achievement. Biller, "Father Absence, Divorce, and Personality Development," in *M. Lamb, supra,* at 506–08; *accord J. Wallerstein & J. Kelly, supra,* at 283. Radin observes that a "recent review of the relevant literature concluded that growing up in a fatherless home is likely to have a damaging effect on the child's cognitive development." Radin, "The Role of the Father in Cognitive, Academic and Intellectual Development," in *M. Lamb, supra,* at 409–10; *accord* "The School's Most Significant Minority," *supra,* 60(1) *Principal* at 33. Other studies showed that "boys from homes without fathers obtained lower scores on all the moral indices—significantly lower on internal moral judgment, guilt, acceptance of blame, prosocial moral values, and conformity to the rules." Hoffman, "The Role of the Father in Moral Internalization," in *M. Lamb, supra,* at 364. Professor Hoffman writes:

> It seems reasonable to conclude that the absence of a father from the home does appear to have a deleterious effect on the moral development of boys. Boys without fathers are apparently more aggressive and less likely to have an internalized moral perspective than boys with fathers. [*Id.* at 365.]

In any event, fathers can no longer be deemed "forgotten contributors to child development." Lamb, "Fathers: Forgot-

ten Contributors to Child Development," 18 *Human Development* 245 (1975), cited in Lamb, "Fathers and Child Development: An Integrative Overview," in *M. Lamb, supra,* at 6.

How best will the father-son relationship be furthered in the absence of custody? The trial court assumed that summer, Christmas, and spring vacation visits with the father are an adequate substitute for weekly visits and that blocking out a substantial number of consecutive days during the year is better than permitting the children frequent visitations throughout the year. Apparently, it believed that a father's availability to his preadolescent sons for guidance and support in their day-to-day lives is relatively unimportant.

There is not one iota of support in the record for this assumption. In fact, the only authority that my research has disclosed indicates the contrary. Professor Biller states that "investigators point out the importance of *frequent* " father-child visiting patterns. Biller, "Father Absence, Divorce, and Personality Development," in *M. Lamb, supra,* at 527 (emphasis added). Kurdek and Berg list the extent of *"regular* visitation by the noncustodial parent" as an important predictor of children's adjustments to their parents' divorce. Kurdek & Berg, "Correlates of Children's Adjustment to Their Parents' Divorces," in *Children and Divorce* 50 (Kurdek ed. 1983) (emphasis added). Dr. Gardner, a psychiatrist, when asked to testify about optimal visitation arrangements, states that "shorter, more frequent visitations [with the noncustodial parent] are preferable to fewer, longer ones." *R. Gardner, Psychotherapy with Children of Divorce* 379 (1976). Rogers and Long found that boys whose fathers were out of town for long periods of time had more difficulties in their sexual identification and development than boys who saw their fathers regularly. Rogers & Long, "Male Models and Sexual Identification: A Case from the Out Island Bahamas," 27 *Human Organization* 326–31 (1958). Wallerstein and Kelly found that "[i]n the youngest children the good father-child relationship was closely related to a *regular and frequent* visiting schedule and to a

visiting pattern that included continuity and pleasure in the visiting. For most children, this meant overnight and weekend stays." *J. Wallerstein & J. Kelly, supra,* at 219 (emphasis added). The authors also found that "infrequent visiting pattern[s]" had an adverse impact on children's academic performance, *id.* at 283, and noted a correlation between infrequent visits from the father and depression among young boys, *id.* at 172. In sum, the social science literature is virtually unanimous in stressing the importance to children of regular, frequent contact with both their parents and in recommending that children's relationships with their noncustodial parents not be lightly disturbed or frustrated.

## IV

The trial court seemed to equate the best interests of the children with the best interests of the custodial parent, ignoring entirely the impact of the noncustodial parent on the child's well-being. In doing so, it followed the guidelines articulated by the Chancery Division in *D'Onofrio v. D'Onofrio, supra,* 144 *N.J.Super.* 200:

> The children, after the parents' divorce or separation, belong to a different family unit than they did when the parents lived together. The new family unit consists *only* of the children and the custodial parent, and what is advantageous to *that* unit as a whole, to each of *its* members individually and to the way they relate to each other and function together is obviously in the best interests of the children. [*Id.* at 206 (emphasis added).]

I disagree. The *D'Onofrio* standard is contrary to preexisting law and to the overwhelming consensus of the social science literature on divorce. Husbands and wives may divorce each other, but they cannot divorce their children. From the children's frame of reference, the members of the family unit are not necessarily changed by their parents' divorce or by the move of one of their parents from the matrimonial home. The children continue to have and to need two parents even after the parents' divorce.

This position is in contrast with *D'Onofrio*'s proposition that the new family unit consists *only* of the custodial parent and

the children, and that what is best for that unit and any of its members is best for the children. The *D'Onofrio* approach diminishes the importance of the child's relationship to the noncustodial parent. It thereby transforms the test from what is in the best interests of the children into what is in the best interests of the custodial parent. *Cf. Grove v. Grove, supra*, 26 *N.J.Super.* 154 (reversing order that had permitted custodial parent to remove child to Florida, and stating, "The order seems * * * to have been responsive to the personal aspirations" of the custodial parent rather than to the welfare of the child).

It is easy to rationalize cutting off children from frequent, easy access to their father, as the trial court's order would have done, on the ground that the custodial parent should be able to move about as freely as the noncustodial parent. But the benefit of full-time custody carries with it the obligation to protect the best interests of the children and, as part of that obligation, a duty to refrain from impeding the children's relationship with the noncustodial parent absent compelling reasons. Children's rights to regular visitation with their father should not be sacrificed merely to accommodate the convenience or whims of their mother.

### V

*N.J.S.A.* 9:2–2 has enunciated a public policy in favor of keeping children of divorced parents in New Jersey. Until today the burden of proving that a child's removal from the state will be in that child's best interests has always been placed on the party who seeks to change the status quo and to come within the rule's exception. That no longer is the guideline.

If I understand the majority correctly, a removal case is to proceed in this fashion. Initially the custodial parent, having a sincere desire to move, must state a sensible, good-faith reason for that move and must show that the move is not contrary to

the best interests of the children. *Ante* at 56. The effect of the move on the children's visitation with the noncustodial parent is not considered when the children's best interests are evaluated. *Ante* at 56. After the threshold showing is made, the trial court is to weigh three "additional" factors: (1) the projected quality of life of the custodial parent and children after the move; (2) the integrity of the parents' motives; and (3) whether a realistic and reasonable future visitation schedule can be reached if the move is permitted. *Ante* at 56–57. The noncustodial parent has the burden of coming forward with evidence on the third factor. *Ante* at 57–58. Finally, the court is to balance "the competing interests of the parties"—in other words, the parents. *Ante* at 58.

The threshold that must be met includes a demonstration that the move is not inimical to the best interests of the children. The majority admits that an adverse impact on the noncustodial parent's visitation would affect these best interests. *Ante* at 54–55. However, visitation is treated by the majority separately, when the court proceeds with its balancing act, rather than as part of the best interests determination, and the burden of coming forward with evidence on that issue is shifted from the custodial parent to the defendant. Who has the ultimate burden of persuasion that the removal may be sanctioned is unclear.

The Legislature has not amended *N.J.S.A.* 9:2–2; only the Court's perception of it has changed. No policy reasons have been advanced why the key focal point should not remain what is in the best interests of the children. Nor has any compelling reason been advanced for separating out visitation, which may critically affect the best interests of children, from the best interests determination, and shifting the burden of coming forward with evidence on that issue from the moving party to

the defendant.[3]  I would adhere to the existing state of the law: the moving party must establish "cause," meaning that the move, considering its possible impact on visitation as well as all other factors, would be consistent with the children's best interests; the adversary has no affirmative defense; the only defense of the noncustodial parent is that the "cause" advanced is not sufficient under the circumstances.

I fully concur in the remand.  The trial court should hear any and all evidence relevant to determining the best interests of the children and identifying the plaintiff's motives for the proposed move.  The record as it now stands is unsatisfactory. The trial court approached the problem as if the test were the best interests of the custodial parent, not the children.  There is a dearth of evidence on the importance of the father-son relationship and the advantages and disadvantages of the possible visitation plans to the children.  No consideration was given to changing the basic custody to the husband so that plaintiff would not have to be restricted to this state.  No deference or weight was given to the parties' voluntary agreement.  Furthermore, more than a year has elapsed since the hearings were held.  The record should be supplemented in a way that will adequately safeguard the best interests of the Cooper children.

SCHREIBER, J., concurring in the result.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and GARIBALDI—6.

*For affirmance*—None.

---

[3]The majority shifts the burden of proof on the visitation issue because it claims that the noncustodial parent has the necessary information.  *Ante* at 57.  *But cf. Gayet v. Gayet,* 92 *N.J.* 149 (1983) (refusing to shift to former wife burden of proving that alimony was still necessary when she was living with another man although she was in possession of all the facts pertinent to her continued need for alimony).