## IN RE: THE FORMER MARRIAGE OF FRANKLIN
### Case No. DR 85-12810
Ninth Judicial Circuit, Orange County
December, 1989

### APPEARANCES OF COUNSEL

**Lee Sasser,** for wife.

**Harvey M. Alper,** Massey, Alper & Walden, P.A., for husband.

### OPINION OF THE COURT

ROM POWELL, Circuit Judge.

### *FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER*

This case came on for trial on November 22, 1989, on the Former

Wife's Supplemental Petition to modify Final Judgment, the Former Husband's Counter-Supplemental Petition to Modify Final Judgment, and the Answers thereto.

On the evidence presented, I make the following findings of fact:

1. The Final Judgment, entered August 8, 1986, following a contested trial, provides for shared parenting of the minor child, Jason, now five years of age. The former wife was awarded primary residence of the child, with visitation by the former husband every Monday from four p.m. until eight p.m., every Wednesday from four p.m. until Thursday at nine a.m., and every Saturday from nine a.m. until Sunday at nine a.m. Although the Final Judgment did not contain a provision prohibiting removal of the child from the State of Florida, the parties have taken the position that a subsequent order of February 4, 1988, has the effect of modifying the Final Judgment to so provide.

2. Both the Former Husband and Former Wife are fit and proper parents, and genuine and close emotional ties exist between each of them and the child. There appears to be no acrimony or hostility existing between the parents.

3. The child is now five years of age. He was born and has lived all of his life in Orlando, Florida, except for six months when the Former Wife took a temporary assignment in Texas with Court approval. The Former Wife was born and raised in Orlando. Her parents live in Orlando. She has an aunt and three cousins residing in Jacksonville, and an aunt and cousins residing in New Smyrna Beach. The Former Husband was raised in Oralndo, having moved here when he was five years of age. He, his parents, three brothers and two sisters have continuously resided here. One of his brother has a son age seven. One of his sisters has two boys, ages two and three. The maternal and paternal extended families are close knit, have extensive contact with the child, and there is interaction between members of both families on an amicable basis.

4. The Former Husband has fully and continuously exercised all of his visitation rights, and has had the child on at least one extended occasion. He has paid two hundred dollars per month in child support on a regular basis, and has offered to provide money for private school for the child, which offer was declined by the Former Wife. The Former Husband makes an approximate gross annual income of twenty-five thousand dollars.

5. The initial and primary reason for the wife wanting to move to San Diego, California, was to marry her fiancee' who lives there and is in business there. He was born and raised in Los Angeles and his

**117**

parents still reside there. He has grandparents and an aunt and uncle residing in San Diego. He is employed by an entertainment production company in San Diego at an annual gross salary of thirty-six thousand four hundred dollars plus some bonuses. Although he only has at present a verbal agreement with the owner of the company, he has an expectancy of greater income and responsibility as the company grows.

6. After deciding to marry, the Former Wife sought and obtained an offer of a position with Sea World of California located in San Diego. She currently works for Sea World of Orlando at an annual base salary of twenty-seven thousand five hundred dollars. The offer is for a base salary of thirty-five thousand dollars. Fifty percent of the difference in salary increase is for the cost of living adjustment since it is more expensive to reside in San Diego.

7. The benefits to Jason from the move would be the higher combined incomes of his mother and stepfather-to-be. Some of the increase in income, however, would be spent on the increased cost of living and transportation between California and Florida. There is no evidence that that school system is better in San Diego. There are more cultural and perhaps more recreational advantages there, and the dryer climate would be better for Jason's asthma.

8. The Former Wife has proposed a revised visitation schedule of every Christmas, spring and summer vacations, and other times when she would visit her family in Orlando. This would necessitate driving two and a half hours to Los Angeles to put Jason on a four hour direct airplane flight at a cost of two hundred fifty to one thousand dollars depending upon when the flight was booked. She has offered to share these expenses with the Former Husband. She would faithfully comply with such schedule, if ordered.

9. The Former Wife testified at the trial that if she is not allowed to relocate with the child to California, she would remain in Florida, marry her fiancee' and retain primary residential care of the child. Her fiancee' testified that if this were the case, he would marry the Former Wife and move here. He also testified that he could find employment within his field here in Florida. If this were the case, there would be no material change of circumstances which would warrant a change of primary residential care to the Former Husband.

Having made the foregoing findings of fact, I now state the following conclusions of law:

A. There is no statute in Florida which prohibits the residential parent from relocating the residence of a child to another state. However, it has long been recognized that Florida courts have the

power to restrict the movement of child's residence upon proper grounds shown. *Giachetti v Giachetti,* 416 So.2d 27 (Fla. 5th DCA 1987).

B. Although the law on the issue of relocation has been rapidly developing in the district courts, the Florida Supreme Court has not yet written an opinion on this point.

C. The Third and Fourth District Courts of Appeal have adopted the New Jersey "real advantage" test set forth in D'Onofrio v D'Onofrio, 365 A.2d 27 (N.J. Ch. Div. 1976), affirmed, 365 A.2d 716 (N.J. App. Div. 1976), as amended in *Cooper v Cooper,* 491 A.2d 606 (N.J. 1984). See *DeCamp v Hein,* 541 So.2d 708 (Fla. 4th DCA 1989); *Matilla v Matilla,* 474 So.2d 306 (Fla. 3d DCA 1985); *Kantor v Kantor,* 14 FLW 1549, — So.2d — (Fla. 3d DCA 1989).

D. The First and Second District Courts of Appeal have not yet expressly adopted the New Jersey test, but have resolved the issue on a case-by-case basis, balancing the competing interests of the parents caused by this change of circumstance against the best interest of the child, but placing emphasis upon the importance of Florida's statutory shared parenting provision which promote mutual parental involvement in decision making and frequent and continuing contact between the child and the non-residential parent. See e.g. *Parker v Parker,* 519 So.2d 673 (Fla. 1st DCA 1988), *review dismissed,* 531 So.2d 1354 (Fla. 1988); *Warren v Warren,* 475 So.2d 736 (Fla. 2d DCA 1985) (Grimes, J.)

E. Our own Fifth District Court of Appeal, by whose opinions I am bound by stare decisis has taken the same approach as that of the First and Second Districts. Giachetti v Giachetti, supra; *Jones v Verba,* 513 So.2d 1080 (Fla. 5th DCA 1987); *Cole v Cole,* 530 So.2d 467 (Fla. 5th DCA 1988). The Court in *Cole* made reference to but did not say that it adopted the holding in the *Cooper* case. *Id.* at 469.

F. In *Giachetti,* supra, the final judgment did not have a non-removal clause but did have a shared parenting provision. The move was to Alaska. The mother's reason for the move was to join her new husband who had moved to obtain better employment opportunities. Both the mother and the new husband had relatives in Alaska. The children were two girls, eight and five. The mother and father were of moderate means which would inhibit flying the children back and forth for visitation. The trial court's injunction against removal was affirmed without prejudice for the mother to petition to modify the Final Judgment and present further evidence.

G. In *Jones v Verba,* supra, the final judgment incorporated a

119

property settlement agreement containing a non-removal clause. The final judgment also contained a grandparent visitation provision. The mother's reason for the move was to be with her new husband who had relocated to enhance his career. The move was to Washington, D.C. The child was a boy. The father had been continuous in his exercise of visitation and his involvement in his son's life had been extraordinary. The grandparents and other family of the child lived in Melbourne where the father lived. The trial court's change of primary residential care to the father was affirmed.

H. In *Cole,* supra, the final judgment incorporated a property settlement provision containing a non-removal clause period. The mother's reason for the move was her new husband's employment. The proposed move was to Kentucky. The child was a boy of five. The father had exercised all of the visitation rights given him. The father's two sisters and their children lived nearby, and his mother lived with him. The trial court's order allowing the child's removal and denying the father's petition for change of primary residential care was reversed.

I. In *Parker,* supra, the final judgment gave primary residence to the mother with reasonable visitation to the father. The mother proposed to marry a naval officer and move with him. The move was from Jacksonville to San Francisco. The father had developed a close relationship with the child, a boy of four years of age, and had spent substantial time with him. The paternal grandparents resided in Jacksonville. The trial court's order modifying the final judgment to prohibit removal and denying removal was affirmed.

J. In *Kantor,* supra, the Third District Court of Appeal, applying the *D'Onofrio/Cooper* test, affirmed a final judgment providing that if the wife moved to California to pursue a modeling career, primary residence of the four year old son would revert to the father in Miami. In its judgment, the trial court noted that ". . . it is in (the child's) best interest to have regular weekly contact with both parents . . ." and ". . . any cross country traveling will be done by the wife and not by (the child) nor the husband . . ."

K. In *Hill v Hill,* 14 FLW 1922, — So.2d — (Fla. 3d DCA 1989), the most recent case decided by the Third District Court, under the *D'Onofrio/Cooper* test, concurring Judge Schwartz in a footnote observed that the trauma of moving from a youngster's familiar surroundings—including other members of the family, friends, school, and the like—may outweigh that involved in separating from the custodian. *Id.* Fn.3. at 1828.

120

L. The public policy of this state is set forth in the following statutes. Section 61.046(11), Florida Statutes (1983) provides: "'Shared parental responsibility' means that both parents retain full parental rights and responsibility with respect to their child and requires both parents to confer so that major decisions affecting the welfare of the child will be determined jointly."

Section 61.13(2)(b)1 states in part: "It is the public policy of this state to assure that each minor child has frequent and continuing contact with both parents after the parents separate or the marriage of the parties is dissolved and to encourage parties to share the rights and responsibilities of child rearing . . ."

Sections 61.13(4)(a) and (4)(a)-(c) further emphasize the importance the legislature have attached to preserving maximum and continuous visitation by the non-residential parent.

M. The assumption of the *D'Onofrio* court and the *Matilla* court that a revised visitation schedule affording blocks of time at long intervals, i.e., Christmas, spring and summer vacations, is better for child and non-residental parent than short but more regular and frequent contacts is a legal assumption and not based upon evidence in those cases or the social science literature. Dr. David Fleischmann, an expert child psychologist, testified at trial that generally the contrary is true. It is my view that Dr. Flesichmann is correct, particularly where, as here, the child is very young and the non-residential parent and child are father and son. See *Cooper,* supra, concurring opinion at pp. 622-3 where Judge Schrieber summarizes the social science literature which substantiates my own view that there is no substitute for the constant guidance and role modeling a divorced biological father can give his own son in the formative years between five and fifteen when the son discovers cars and girls, and thereafter up to and past the age of majority.

Based upon the foregoing findings of fact and conclusions of law, it is my opinion that it is in the best interest of this child, Jason, to remain in Florida in regular contact with his father and his extended maternal and paternal families, and that these factors outweigh the advantages of his mother relocating him to California.

ACCORDINGLY, IT IS ORDERED that:

1. The Former Wife's Supplemental Petition to Modify Final Judgment is denied.

2. The Former Husband's Supplemental Petition to Modify Final Judgment is granted in part, and the Final Judgment is hereby

121

modified to provide that the Former Wife shall not remove the child from the State of Florida for the purpose of establishing residence elsewhere without prior express written consent of the Former Husband or order of this Court. She may, however, take the child out of state for periods up to two (2) weeks for vacations without such consent or court order. The Former Husband's Supplemental Petition is denied insofar as it seeks change of primary residential care.

3. Each party shall bear his or her own costs and attorney's fees, except that the parties shall share equally the cost of this transcript.

Orlando, Florida, this day of December, 1989.