687 A.2d 1057

ANDREW LEVINE, PLAINTIFF–APPELLANT, v. ROSEMARY LEVINE BACON, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued December 10, 1996—Decided February 6, 1997.

Before Judges MICHELS, KLEINER and COBURN.

*Drew M. Hurley* argued the cause for appellant.

*Jennifer Weisberg Millner* argued the cause for respondent (*Szaferman, Lakind, Blumstein, Watter & Blader,* attorneys; *Ms. Millner* and *Stacey M. Geurds,* of counsel and on the brief).

The opinion of the court was delivered by

MICHELS, P.J.A.D.

Plaintiff Andrew Levine appeals from an order of the Chancery Division, Family Part, that denied his motion for permission to permanently remove Jessica Levine, the minor child born of his marriage to defendant Rosemary Levine Bacon, from New Jersey to Florida.

Plaintiff and defendant were married on March 17, 1988. Jessica, the parties' only child, was born to the couple on October 6, 1988. The parties separated in or about May 1990, with plaintiff

taking custody of Jessica. Plaintiff filed for divorce in June 1990. A *pendente lite* custody order was filed August 23, 1991, designating plaintiff as primary residential parent. This order set defendant's visitation schedule and required her to pay child support. Following a settlement of the matter, a Final Judgment of Divorce was entered on January 13, 1992, which, in pertinent part, provided:

1. That the plaintiff and defendant shall have joint legal custody of Jessica Lyn, the minor child of the marriage. The plaintiff shall be the primary residential parent.

2. The defendant shall have visitation with the minor child on two consecutive weekends from Friday at 5 p.m. until Sunday at 5 p.m. After two consecutive weekends the defendant shall have visitation with the child on Wednesday from 5 p.m. until 12 noon the next Thursday. The defendant shall then have no visitation on the third weekend. The defendant shall have visitation on the Wednesday following the third weekend when she has no visitation from Wednesday at 5 p.m. until the next Thursday at 12 noon. Thereafter the defendant shall recommence this visitation schedule on the next weekend. The defendant shall be responsible for picking up and dropping off the child on the aforesaid days and times except that the plaintiff shall pick up the child at 12 noon on Thursdays as aforesaid at the home of the defendant.

3. Each party shall have the right to two weeks summer visitation with the child (which may or may not be consecutive) during which time the other parent will have no custodial time or visitation. Each party shall give the other party 60 days notice of when they intend to exercise their summer visitation.

The judgment also set forth the holiday visitation schedule and required defendant to pay $40 per week in child support. According to plaintiff, when Jessica started school in 1993, the schedule was revised and the Wednesday overnights were eliminated. Visitation now occurs on Thursdays from 3:30 p.m. to 8:00 p.m. Nevertheless, with this schedule, defendant usually spends two days per week with Jessica in addition to the vacation period.

In August 1992, plaintiff married Valerie Levine (Valerie), a Hillsboro psychologist, with whom he now lives in Princeton. In December 1994, defendant married Dylan Bacon (Dylan), with whom she now lives in Princeton. They have a child named Savannah, who was born on August 3, 1993.

For the past thirteen years, plaintiff managed Bond Cleaners, a Trenton dry cleaning plant with about twenty-five employees,

which his father owned. Bond Cleaners' clientele included large hotel accounts, as well as wholesale accounts, and a very good walk-up retail trade. As manager, plaintiff handled the hotels' complaints and was responsible for managing everything except the money. He scheduled employees; trained new help; watched the distributions, the drop stores, and the hotels; ran the drycleaning and laundry departments; and looked over sales. His responsibilities included quality control, employee problems, occasional payroll problems, and special requests by customers on their garments.

Plaintiff's father sold Bond Cleaners in November of 1994. As a condition of sale, plaintiff signed a restrictive covenant/covenant not to compete for which he was paid consideration. This agreement prevented plaintiff and his father from opening or working with the same or similar business within a twenty-five mile radius of the New Jersey counties of Camden, Burlington, Mercer, Middlesex and Somerset, as well as Bucks County, Pennsylvania, for a period of ten years.

Pursuant to an employment agreement, dated November 14, 1994, plaintiff received $900 per week plus benefits to remain at Bond Cleaners until July 14, 1995 and teach the new owner the business. Plaintiff claimed that there was no possibility for an extension of this contract. He also stated that he looked for but could not find a drycleaning plant manager position in those New Jersey counties not implicated by the restrictive covenant and looked at numerous issues of *American Drycleaner*, a national publication that lists employment opportunities in the industry, but found no New Jersey listings.

In light of his claim of a lack of employment opportunities in this State, plaintiff now wishes to move to Florida. According to plaintiff, the owner of Clean–Pro, a business in Florida, has offered him a "ground floor" position selling software systems, used by the dry cleaning industry, on Florida's west coast. Plaintiff claims that he will need additional training regarding computers before he is able to sell the product effectively. Further,

according to plaintiff, his sales will initially target the Sarasota area but, based on discussions with the owner of the business, he anticipates eventually moving into a sales management position. Plaintiff claims that if he could find a job in New Jersey similar to his Florida offer, he would consider staying.

If he moves to Florida, plaintiff anticipates that he will initially be working out of his home for two full days, not including weekends. He expects to spend the other three weekdays on the road for at least five hours a day. Plaintiff admitted, however, that he is unsure exactly where his sales territory will be and, thus, the time he would spend outside of his home office might vary. If he had to go to Naples, Florida for business, he admits he would spend at least four total hours traveling to and from the city. Plaintiff further acknowledges that he might have to travel as far as Tallahassee, which is about six hours from Sarasota and would require an overnight trip.

In regard to remuneration, plaintiff was offered $750 a week to start and a commission of 5% on a software only sale and 10% on a combined software and hardware sale. Additionally, plaintiff would receive medical benefits and three weeks vacation. Based upon his discussions with the owner, plaintiff anticipates earning an additional $2,000 per month, which represents a total salary of approximately $50,000 plus benefits.

Plaintiff and Valerie wish to sell their New Jersey home and buy a single-family home near Sarasota, which they describe as a culturally rich area located twenty minutes from his parents' home and defendant's parents' home. He anticipates getting a bigger house for less money in Florida because building costs, as well as all costs, are generally lower there. Plaintiff does not believe that moving Jessica to Florida would be harmful to her in any way. He and Valerie researched the Sarasota area schools and found them to be "very good." Plaintiff testified that Jessica would attend public school, but if "she wasn't challenged in public school, then we would consider private school."

Plaintiff admitted that Princeton has an excellent school system and is also a culturally rich area. In comparing schools in Princeton and Sarasota, plaintiff admitted that he knows the Sarasota schools are "not as good as [those in] Princeton." However, plaintiff claimed that even if the court denied his application and he stayed in New Jersey, he would not be able to remain in Princeton because of the covenant. Thus, he anticipates he would need to either move to another county where he can work or possibly go back to school.

Plaintiff believes that his work schedule in the Florida job would enable him to spend more time with Jessica than he currently does, allowing him to put Jessica on the bus in the morning and to be there when she gets home from school every day. Plaintiff also claims that if allowed to move to Florida, he "would promote visitation and a healthy relationship with both sets of [Jessica's] grandparents." While he hopes to "mend our fences," plaintiff acknowledged that the grandparents are no longer speaking to one another and that he is also currently not speaking with defendant's parents.

Plaintiff claims that health concerns for Jessica, who has had a chronic cough every winter since she was born, and for Valerie, who suffers from "chronic cold weather induced asthma," have contributed to his desire to move to Florida. Plaintiff asserts that a warmer climate would be healthier for Jessica and would substantially help Valerie's condition.

A great deal of testimony was directed to the parties' respective parenting skills, their communication with one another, and descriptions of the alternative environments to which Jessica would be exposed. A recitation of this evidence is not essential except to point out that plaintiff claimed that when defendant has visitation with Jessica, she restricts Jessica from contacting him. Defendant claims she only prevented Jessica from calling plaintiff on one occasion and explained that she had just picked Jessica up and walked into the house when Jessica said that she wanted to call her dad. Defendant explained her reaction at the time: "We had

just gotten [home] and I really hadn't seen her for a few days and I had some things planned, and I told her that she could call him later." Defendant described her reaction to Jessica's request as unusual, attributing it to the tension of the litigation, and claimed it would not happen again.

Defendant testified regarding plaintiff's lack of communication and cooperation in decisions pertaining to Jessica and her welfare. Defendant recalled difficult experiences with plaintiff in arranging visitation with Jessica, and described plaintiff as inflexible and unreasonable in regard to her visitation with Jessica. Defendant recalled that plaintiff had refused her past requests to spend time with Jessica even though Jessica was left alone with a baby-sitter. Plaintiff admitted that he had, on occasion, refused defendant's requests to have Jessica for an additional night.

Plaintiff further admitted that there have been instances when he should have consulted defendant but instead made decisions regarding Jessica's welfare on his own. Specifically, plaintiff acknowledged that in 1992, he should not have enrolled Jessica in a Jewish nursery school "without consulting Rosemary's opinion first[.]" Plaintiff acknowledged that Jessica's enrollment in this school affected defendant's visitation schedule because Jessica had to be at school at 8:30 a.m., meaning defendant lost the benefit of overnight visitation twice a month. Defendant was also upset that plaintiff had enrolled Jessica in a Jewish preschool because "the agreement that I had with him[, although not in writing,] was that I was to be responsible for her religious background." Plaintiff originally admitted that despite an agreement with defendant to raise Jessica in the Christian religion, he has brought Jessica up in the Jewish religion without consulting defendant. Plaintiff further acknowledged that he should have consulted defendant regarding Jessica's religious upbringing. Plaintiff, however, later denied bringing up Jessica in the Jewish faith, stating that she does not go to Hebrew school or temple.

Plaintiff also admitted that, contrary to his reply certification, he has taken Jessica "to several doctors without clearing it with

Rosemary first[.]" Yet, plaintiff testified that defendant never requested that he notify her before taking Jessica to a doctor. Plaintiff also admitted that although he should have, he never discussed with defendant bringing Jessica to a Dr. Boozan, until afterward, nor did he discuss bringing Jessica to Dr. Rhoades, a therapist. Plaintiff testified that prior to taking Jessica to Dr. Rhoades, he sent defendant "a registered letter telling [defendant] where we were taking [Jessica], when we were taking her and offering [defendant] the ability to join in if she would like." Plaintiff stated that after sending the letter, defendant never contacted him, but instead called Dr. Rhoades. Defendant claims that she spoke with plaintiff two weeks prior to receiving this letter during which plaintiff never said anything about Jessica behaving abnormally, having nightmares, eating improperly, or having problems in school—the alleged reasons plaintiff brought Jessica to Dr. Rhoades.

Plaintiff admitted that last year, he and Valerie met with the principal of Jessica's school, and decided that Jessica should repeat kindergarten. Defendant neither knew of nor had any input into this decision. Plaintiff claims he spoke with defendant about this issue previously and defendant said she would defer to Jessica's teacher's opinion. Despite her contentions, defendant testified that she had numerous phone conversations with Jessica's teachers regarding her development at school, and attended two parent/teacher conferences in each of the last two years. In addition, defendant stated that at one conference at the end of Jessica's first year in kindergarten, Jessica's teacher opined that Jessica ought to be held back. Defendant trusted the teacher's opinion and thought the matter was settled.

Defendant claimed that a further example of plaintiff's lack of communication occurred during December 1994 when both parties were visiting their respective parents in Florida, and defendant was exercising an extended visitation with Jessica. Defendant allowed plaintiff to have an unscheduled day of visitation with Jessica. According to plaintiff, when he picked up Jessica, she

had a cough which seemed to get worse as the evening went, and plaintiff took Jessica to the hospital. While plaintiff admitted that he should have consulted defendant prior to bringing Jessica to the emergency room, he did not believe that he was obligated to notify defendant in emergency situations. During the four hours in the emergency room, plaintiff made no attempts to call defendant; he did not tell defendant until the following morning that Jessica had been taken to the hospital.

Defendant described her current residence as a "very large" apartment that is very comfortable. Defendant, her mother, and her sister all claim that the home is safe for children. Jessica has her own room, which she helped decorate, and, according to defendant, she appears very comfortable there. Defendant's mother testified that Dylan and defendant seemed very happy together. Dylan declared that he loves defendant very much and that they have a very happy and communicative relationship with one another.

Defendant's parents and Dylan testified that defendant and Jessica have a very good relationship and that defendant is very attentive. Defendant's sister noted that when Jessica's visits end, "[s]he doesn't want to leave her mom." Defendant also stated that Jessica is very fond of Dylan, explaining that "[h]e's very patient with her and they like to do a lot of things together." Defendant's sister, who has had the opportunity to observe Dylan with Jessica, had never seen him hit her or forcefully take anything away from her and had only seen him discipline her through a simple reprimand if she did something wrong. Defendant further maintained that Jessica and Savannah get along well.

Defendant testified that when Jessica is over, they visit members of her family. Defendant's sister has two children, and her brother has two children. On Dylan's side of the family there are several cousins. Dylan also has a younger brother of whom Jessica is very fond. In addition, defendant and Dylan have relatives close to Jessica's age with whom she enjoys playing.

The majority of Dylan's family lives in New Jersey, and he and Savannah see them often.

When she does not have visitation with Jessica, defendant claims to have phone conversations with her almost daily. Defendant testified that these phone conversations are "a lot different" than when she actually sees Jessica because "[a]t six years old she can't really carry on a long conversation over the phone. It's usually brief.... I ask her questions, but it's not the same as having her with me and sitting on my lap when we talk and we have quiet time together."

Plaintiff described his present marriage to Valerie as consisting of "a lot of mutual respect, trust." In her practice, Valerie works with separated and divorced parents, is involved in removal actions as an expert, and has been a court-appointed evaluator in domestic cases. Valerie is planning to move with plaintiff to Florida. She has applied for licensure in Florida and is going to seek a position in a group practice. Valerie, who has already "made some contacts," does not believe that she will have any problem securing a position. According to plaintiff, Valerie and Jessica "have a very healthy, loving relationship," consisting of "mutual respect."

Plaintiff acknowledged that if he is permitted to move, the present visitation schedule that defendant has with Jessica would have to change. In this regard, plaintiff proposed the following schedule:

> [T]wo weeks visitation in July, two weeks in August, a week at Christmas and Easter vacation with her mother according to the school calendar and two other— two other trips sometime[ ] during the year with her mother coming down to Florida.

Plaintiff opined that defendant's cost in visiting Jessica in Florida would be lessened since visitation could occur at defendant's mother's house. Nevertheless, plaintiff admitted defendant would incur a financial burden visiting Jessica. Thus, he proposed that defendant put the money she pays for child support towards the airfares and that he would pay a mutually agreed upon amount to supplement the costs. Plaintiff, however, admitted that he did

not know what he would do if he did not have the money to pay for this travel expense. Yet, plaintiff acknowledged that he would be willing to negotiate defendant having additional visits with Jessica if she were in Florida on a non-visitation weekend. He further claimed that he would encourage and pay for telephone calls and other correspondence between defendant and Jessica.

Both defendant and Dylan regarded the proposed visitation schedule as not feasible. Defendant testified:

> It wouldn't be the same going for so long without seeing her. I know that I could talk to her on the phone, but that just wouldn't be the same, as I had explained earlier, with—you know, the telephone conversations just aren't the same as having her there and talking to me when we're together. I don't think that it would be as comfortable not seeing her for so long. . . . I wouldn't be able to attend the things at school that I've had the opportunity to attend in the past two years. I wouldn't be able to discuss her school work, her development in school, her friends. . . . During the holidays it would be hard if I was to leave my family or Dylan was to leave his family to go up here or she was to—to go down there, rather—or she was to come up here to see us. . . .
>
>  . . . .
>
> Jessica spends a lot of time with my family and with Dylan's family. We have a lot of children in our family that Jessica is very close to and we're very family oriented. All of our family lives in this area and she would be away from all [of] them for large periods of time too.
>
>  . . . .
>
> If I were to go to Florida, I would have some choices, but I don't think any of the choices would work. If I took Savannah to Florida with me, she'd be without her father. Dylan wouldn't be able to come to Florida with us that much because obviously he works and he doesn't get that much time off from work. It would also be very expensive, especially during the holiday times. . . .

Dylan stated he would be unable to accompany defendant to visit Jessica because of his employment responsibilities. Moreover, he stated that if defendant was to leave his household for one to three weeks at a time, he would be greatly affected. Dylan also explained that "Jessica's sibling, Savannah, would need child care during this time. Financially, we can't afford to send Savannah with Rosemary. If Savannah were to stay here, Savannah would be going without her mother during the times [Rosemary] spent with Jessica." Dylan further testified that if that were to happen he would need to get day care, which he cannot afford.

Defendant and Dylan seriously discussed moving to Florida. Defendant believes that her family would be unable to move there due to Dylan's inability to find a job which would offer him the same benefits he currently receives. Dylan, who is twenty-four years old, is currently employed as a superintendent at an apartment complex for which he earns $17,000 a year and receives free housing worth about $1,000 per month and health insurance. Dylan also works as a maintenance person at a health food store for which he is paid $150 a week and given a 20% food discount. Dylan does not have a written employment contract with either employer.

Although Dylan acknowledged Florida's cost of living is lower than New Jersey's, he also found Florida's salaries to be much lower after looking at newspaper ads provided by plaintiff and calling some of the numbers listed therein. Furthermore, according to Dylan, there seems to be unemployment problems in Florida, which makes him feel that such a move "would be a very high risk."

In addition, Dylan claimed he asked defendant's parents about the job opportunities in Florida, but admitted that he did not ask them for any newspapers or for any leads for employment agencies. Dylan did not make any calls after receiving a magazine listing apartment complexes and did not check Sarasota housing costs. Defendant claimed that she also had conversations with her family concerning the Florida job market and was informed the market was not good. Although defendant is currently unemployed, she was trained and has worked as a bartender, a waitress, and a customer service representative in a supermarket. She also went to travel and tourism school.

In February 1995, plaintiff moved before the trial court for an order (1) permitting him to permanently remove Jessica to Florida; (2) amending and modifying the Final Judgment of Divorce with regard to defendant's schedule of visitation with Jessica; and (3) restraining and enjoining defendant from speaking with Jessica about the removal process or in any way trying to manipulate the

child to tell the court or any expert that she wants to remain with defendant. Defendant filed a cross-motion, seeking to modify the custody arrangement to designate her as Jessica's custodial parent.

On the return date of the motions, the trial court ordered a hearing and appointed Dr. Michael Orlosky, a psychiatrist, to "perform an evaluation of the parties and minor child to assist the [c]ourt in making a determination on [p]laintiff's motion to remove the minor child to Florida and on [d]efendant's motion for a change in physical custody of the minor child." Dr. Orlosky's report of June 8, 1995, which the parties stipulated into evidence, made the following recommendations:

> The present arrangement for Jessica has for the most part been a positive one. She has access to both parents and both Rosemary and Andrew have shared in her developmental years. It is unfortunate that Andrew was not able to locate suitable work in the New Jersey area so that Jessica's access to both parents could continue. However, his planned move to Florida necessitates a consideration of where Jessica would primarily reside since the distance between the two homes is not conducive to frequent visitation.

> As I noted above, Jessica is a young child who has shown some difficulty in the early stages of her education. I believe that she is likely to be a special child whose academic and emotional needs will be above average. She will need an environment that provides a comforting emotional tone, patience, the ability to plan for her future needs, and the knowledge to assist her in the developmental tasks she will face. These were qualities that were more readily apparent with Andrew than with Rosemary. Andrew has kept a good focus on giving his daughter what she needs and has a history of greater emotional stability and material resources. I believe that he will do a very good job in continuing to be Jessica's primary custodial parent.

> While Rosemary has loving feelings for Jessica, she has not demonstrated the emotional steadiness that Andrew has had, and her responses to questions in the interview showed a lesser degree of sophistication in thinking about Jessica's needs. Her frustration tolerance is less than his, and I believe that the daily responsibilities of two children would very likely exceed her capacity to remain patient. For these reasons, I see her as the less capable parent for primary custody.

> Obviously, an adjustment in visitation for Rosemary will need to be made to compensate for the lack of frequent contact with Jessica. School vacation periods and holiday times will need to be arranged so that Jessica can spend time with her mother. Rosemary and Andrew will need to reach a decision on this. It is important that Jessica be able to see her mother and have other contacts, such as telephone and letters.

Dr. Orlosky did not specifically address the issue of whether Jessica should be removed to Florida. Rather, his recommendation apparently assumes that Jessica would be removed to Florida. In fact, in his Probation Report dated June 30, 1995, Sam Altobelli, a senior investigator in Mercer County, commented on Dr. Orlosky's failure to address the relocation issues:

[Andrew] appeared to be concerned about Jessica's relationship with her mother, in which, it seems, he favored her seeing her mother, yet was or is, willing to relocate some 1500 miles away, which this officer believes will have an adverse effect on Jessica who has expressed a great deal of love and affection for her mother, her sister and for Dylan. *It did not seem that Dr. Orlasky's [sic] report addressed that problem.*

[Emphasis added.]

Prior to the plenary hearing, defendant withdrew her cross-motion to designate her as Jessica's custodial parent. At the conclusion of the proofs, the trial court denied plaintiff's motion for removal of Jessica to Florida, reasoning in part that

[a]ccording to the Supreme Court, the beacon remains the best interests of the children. In the present case, the plaintiff has advanced the opportunity for a new job as the reason for his move to Florida. The plaintiff claims that he is unable to find a job in this geographic area due to the non-compete clause of the sales agreement.

The plaintiff's proofs on his claim that he was unable to find a job, other than a job in the dry cleaning field, were lacking. The plaintiff failed to make an adequate showing that he made a strong search for a job in this area in a field unrelated to dry cleaning. Despite this finding, the Court concludes that the plaintiff has been offered a good job opportunity in Florida. As such, the Court finds that the reason for the move advanced by the plaintiff is a sincere, good faith reason, *Cooper v. Cooper*, 99 *N.J.* 42 [491 *A.*2d 606] (1984).

The Court must now ... [determine] whether the move would be inimical to the best interests of the child or adversely affect the visitation rights of the non-custodial parent.

According to all the witnesses who testified in this matter, each of the parties enjoys a good relationship with Jessica. They each share time with Jessica and participate in her activities. They are both keenly interested in her future development. Additionally, both parties' families and new spouses also have contact with Jessica and ... care a great deal about her. Furthermore, Jessica enjoys her visits and contact with her sister, Savannah. These facts were reflected in Dr. Orlosky's report when he concluded that the present arrangement for Jessica has for the most part been a positive one.

Clearly, a move to Florida would affect a significant change in this arrangement. The current visitation schedule would have to be replaced by one which would

permit longer but less frequent contact with the defendant. Due to the work demands of Mr. Bacon and the school schedule of Savannah as well as the financial cost of travel, Jessica would lose most of the benefits of the current arrangement, including her relationship with her mother and her sister.

A move to Florida would also adversely affect the defendant's involvement and participation in the critical decisions regarding Jessica. This problem is of great concern to the Court, especially in light of Dr. Orlosky's statement that Jessica has benefitted by the parents' sharing in her development[al] years.

The fact that the plaintiff has already begun to disregard the defendant in several important decisions regarding Jessica is critical in this regard. Such conduct on the part of the plaintiff cannot be expected to improve if the plaintiff and Jessica are separated from the defendant by a distance of 1,500 miles.

The Court must also consider whether the move will adversely affect the visitation rights of the non-custodial parent. At the present time, the defendant visits Jessica two weekends in a row and the Thursday before and after the third weekend, which is the father's weekend. The defendant has the child two weeks a year for vacation, as well as Christmas, Easter, Mother's Day, and alternate holidays.

Under the present arrangement, the visitation is frequent. In place of the current arrangement, the plaintiff proposes the following schedule: Two weeks in July, two weeks in August, one week at Christmas, one week at Easter, and two other trips during the year. When one compares this schedule with the present schedule, it is apparent that the proposed schedule trades their frequency of contact now enjoyed by the defendant and Jessica for the possibility for the mother and daughter sharing larger blocks of time. Other than July and August, however, the rest of the year will be marked by an absence of personal visits for periods of up to two months.

The obvious problem with the proposed schedule is that the personal contact between parent and child and sister and sister will be lost and with that loss most assuredly will come the loss of the current positive relationship between the mother and daughter.

There are additional problems with the proposed schedule as well. The defendant will be unable to afford the cost of the frequent trips to and from Florida, even if she were permitted to use the child support arrearages for the cost of the trips. If, as suggested by the plaintiff, the arrearages were used to purchase the airline tickets, this would only cover the cost of the flights for the first year and, as the plaintiff admitted in his testimony, he is not sure how the defendant would afford the cost of travel if the air fare increased significantly.

There are also time constraints on the defendant and the demands of her new family, including her new daughter, which would make it impossible for her to be able to exercise her visitation during the blocks of time suggested by the plaintiff.

In addition to the foregoing, however, the Court must also consider whether the non-custodial parent could relocate as a means of ensuring the custody arrangement, *Rampolla v. Rampolla*, 269 *N.J.Super.* 300 [635 *A*.2d 539] (App.Div.1993).

In the instant case, the defendant's current husband is a maintenance man at an apartment complex. As part of his consideration, he receives the apartment in which he lives. He also works part time at a local health food store to supplement his income. He made a review of employment advertisements for similar jobs in Florida and was unable to find any positions which offered a residence as part of the consideration.

Under these circumstances, the Court is unable to conclude that a move to Florida by the defendant and her new family is a valid alternative.

For the foregoing reasons the Court finds that although the plaintiff has advanced a good faith reason for the requested move to Florida, the move would not be in the best interest of the child and cannot be accomplished without a significant adverse effect on the defendant's visitation with the child.

Plaintiff appeals, seeking a reversal of the order and the entry of an order permitting him to permanently remove Jessica to Florida. He contends that (1) the trial court abused its discretion in not permitting him to remove Jessica to Florida; (2) the trial court committed plain error in its application of the facts to the Appellate Division's holding in *Rampolla v. Rampolla*, 269 *N.J.Super.* 300, 635 *A.*2d 539 (App.Div.1993); and (3) the trial court's findings of fact and conclusions of law were inadequate and not in compliance with *R.* 1:7–4. We disagree and affirm.

We are satisfied from our study of the record and the arguments presented that the trial court did not mistakenly exercise its discretion in denying plaintiff's motion to permanently remove Jessica to Florida. There is substantial credible evidence in the record as a whole to support the trial court's findings and conclusions in this regard, and there is no sound reason or justification for disturbing them. *Leimgruber v. Claridge Assoc., Ltd.,* 73 *N.J.* 450, 455–56, 375 *A.*2d 652 (1977); *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.,* 65 *N.J.* 474, 483–84, 323 *A.*2d 495 (1974).

The pivotal issue raised by this appeal is whether the trial court mistakenly exercised its discretion by precluding plaintiff from removing Jessica to Florida. The determination of that issue begins with *N.J.S.A.* 9:2–2, which provides:

When the Superior Court has jurisdiction over the custody and maintenance of the minor children of parents divorced, separated or living separate, and such children are natives of this State, or have resided five years within its limits, they shall not be removed out of this jurisdiction against their own consent, if of suitable

age to signify the same, nor while under that age without the consent of both parents, unless the court, upon cause shown, shall otherwise order. The court, upon application of any person in behalf of such minors, may require such security and issue such writs and processes as shall be deemed proper to effect the purposes of this section.

In analyzing this statute, our Supreme Court in *Cooper v. Cooper*, 99 *N.J.* 42, 50, 491 *A.*2d 606 (1984), determined that

[t]he statutory language affirms that the purpose of the statute is to preserve the rights of the noncustodial parent and the child to maintain and develop their familial relationship. This mutual right of the child and the noncustodial parent to develop and maintain their familial relationship is usually achieved by means of visitation between them. Because the removal of the child from the state may seriously affect the visitation rights of the noncustodial parent, the statute requires the custodial parent to show cause why the move should be permitted.

The Court in *Cooper* clarified the standards to be followed in determining whether to permit the custodial parent to remove a child from this state:

When removal is challenged under *N.J.S.A.* 9:2–2, we hold that to establish sufficient cause for the removal, the custodial parent initially must show that there is a real advantage to that parent in the move and that the move is not inimical to the best interests of the children. Removal should not be allowed for a frivolous reason. The advantage, however, need not be a substantial advantage but one based on a sincere and genuine desire of the custodial parent to move and a sensible good faith reason for the move. To establish that the move is not inimical to the best interests of the children, the moving party must show that no detriment to the children will result from the move.

[*Id.* at 56, 491 *A.*2d 606.]

According to the *Cooper* Court,

[t]he decision as to whether the moving party has met the threshold requirement does not include consideration of the visitation issue. It is only after the custodial parent establishes these threshold requirements that the court should consider, based on evidence presented by both parties, visitation and other factors to determine whether the custodial parent has sufficient cause to permit removal under the statute.

[*Ibid.*]

Under *Cooper*, once the custodial parent makes the threshold showing, then the court must consider additional factors:

The first factor to be considered is the prospective advantages of the move in terms of its likely capacity for either maintaining or improving the general quality of life of both the custodial parent and the children. The second factor is the

integrity of both the custodial parent's motives in seeking to move and the noncustodial parent's motives in seeking to restrain such a move (e.g., whether the custodial parent is motivated by a desire to defeat and frustrate the noncustodial parent's visitation rights and remove himself or herself from future visitation orders or whether the noncustodial parent is contesting the move mainly to impede the custodial parent's plans or to secure a financial advantage with respect to future support payments). And the third factor is whether, under the facts of the individual case, a realistic and reasonable visitation schedule can be reached if the move is allowed. In a given case, evidence of any of these factors may be used to militate against either the threshold showing of the custodial parent for removal, or the arguments of the noncustodial parent against removal.

[Id. at 56–57, 491 A.2d 606.]

## The Court thereafter explained that

[a] realistic and reasonable visitation schedule is one that will provide an adequate basis for preserving and fostering a child's relationship with the noncustodial parent if the removal is allowed. When there has been a pattern of weekend visitation, "a court should be loath to interfere with it by permitting removal of the children for frivolous or unpersuasive or inadequate reasons." D'Onofrio [v. D'Onofrio], supra, 144 N.J.Super. [200] at 206 [365 A.2d 27 (Ch.Div.1976)] (citing Grove v. Grove, 26 N.J.Super. 154 [97 A.2d 505] (App.Div.1953)).

[Id. at 57, 491 A.2d 606.]

## In regard to the burden of proof, the Cooper Court held:

Since the noncustodial parent has the necessary information to demonstrate that an alternative visitation schedule is not feasible because of distance, time, or financial restraints, we place the burden on that parent to come forward with evidence that a proposed alternative visitation schedule would be impossible or so burdensome as to affect unreasonably and adversely his or her right to preserve his or her relationship with the child. We emphasize that more than a showing of inconvenience by the noncustodial parent is required to overcome a custodial parent's right to remove the children after he or she has met the threshold showing that the move would be a real advantage to him or her and would not be inimical to the best interests of the children.

[Id. at 57–58, 491 A.2d 606.]

## Lastly, the Cooper Court instructed that

[t]he more evidence there is that the noncustodial parent's visitation with the children will be adversely affected, the more of a showing of compelling reasons to move must be made by the custodial parent. If it is shown that a noncustodial parent's visitation would be adversely changed or curtailed by the move, the court should require a very substantial or compelling showing of advantage by the custodial parent before allowing the move.

[Id. at 58, 491 A.2d 606.]

The standard set forth in *Cooper v. Cooper, supra,* was subsequently modified by the Court in *Holder v. Polanski,* 111 *N.J.* 344, 352–53, 544 *A.*2d 852 (1988), by eliminating the requirement that the custodial parent show a real advantage to the move. The Court in *Holder* held that "a custodial parent may move with the children of the marriage to another state as long as the move does not interfere with the best interests of the children or the visitation rights of the non-custodial parent." The *Holder* Court, in modifying the *Cooper* standard, ruled that

> the focus of the "cause" requirement should not be on the benefits that will accrue to the custodial parent but on the best interests of the children and on the preservation of their relationship with the noncustodial parent. From that perspective, the "cause" requirement of *N.J.S.A.* 9:2–2 implicates the best interests of the child as manifested through visitation with the noncustodial parent. *Cooper v. Cooper, supra,* 99 *N.J.* at 50 [491 *A.*2d 606]; *D'Onofrio v. D'Onofrio, supra,* 144 *N.J.Super.* at 204–05 [365 *A.*2d 27]. Short of an adverse effect on the noncustodial parent's visitation rights or other aspects of a child's best interests, the custodial parent should enjoy the same freedom of movement as the noncustodial parent. *See Wilkie [Wilke] v. Culp,* 196 *N.J.Super.* 487, 496 [483 *A.*2d 420] (App.Div.1984) (the law favors visitation and protects against the thwarting of visitation rights), *certif. den.,* 99 *N.J.* 243 [491 *A.*2d 728] (1985); *In re Jackson,* 13 *N.J.Super.* 144, 145, 147 [80 *A.*2d 306] (App.Div.1951) (visitation with noncustodial parent should be set up to encourage mutual affection); *Turney v. Nooney,* 5 *N.J.Super.* 392, 397 [69 *A.*2d 342] (App.Div.1949) (happiness and welfare of child determining factor in custodial decision).

> [*Id.* at 352, 544 *A.*2d 852.]

Thus, the Court modified the "cause" test announced in *Cooper* and held that "any sincere, good-faith reason will suffice, and that a custodial parent need not establish a 'real advantage' from the move." *Id.* at 352–53, 544 *A.*2d 852. The Court explained:

> Once the court finds that the custodial parent wants to move for a good-faith reason, it should then consider whether the move will be inimical to the best interests of the children or adversely affect the visitation rights of the noncustodial parent. Not every change in a visitation schedule will prejudice those rights, particularly if the noncustodial parent has not exercised them before the custodial parent seeks to move from the state. If the move will not substantially change the visitation rights, then the court should determine whether the move would be inimical to the best interests of the children.

> [*Id.* at 353, 544 *A.*2d 852.]

The Court further stated:

> If, however, the move will require substantial changes in the visitation schedule, proofs concerning the prospective advantages of the move, the integrity of the motives of the party, and the development of a reasonable visitation schedule remain important. *Cooper v. Cooper, supra,* 99 *N.J.* at 56–57 [491 *A.*2d 606]. The emphasis, however, should not be on whether the children or the custodial parent will benefit from the move, but on whether the children will suffer from it. *See Ibid.* Motives are relevant, but if the custodial parent is acting in good faith and not to frustrate the noncustodial parent's visitation rights, that should suffice. Maintenance of a reasonable visitation schedule by the noncustodial parent remains a critical concern, but in our mobile society, it may be possible to honor that schedule and still recognize the right of a custodial parent to move. In resolving the tension between a custodial parent's right to move and a noncustodial parent's visitation rights, the beacon remains the best interests of the children.
>
> [*Ibid.*]

In light of these principles, we are thoroughly convinced that the trial court properly denied plaintiff permission to permanently remove Jessica to Florida. Contrary to plaintiff's claim, the move will be inimical to Jessica's best interests and adversely affect defendant's important visitation rights.

The proofs established beyond question the close relationship that Jessica enjoys with defendant. There was extensive credible testimony regarding the many activities in which defendant and Jessica participate together. Additionally, the proofs established the close relationship that Jessica and Savannah enjoy, as well as the close relationship that Dylan and Jessica enjoy. The proofs also established that on weekends, Jessica often visited with her cousins who are close to Jessica's age and live in New Jersey.

The trial court found that the visitation schedule proposed by plaintiff represented a dramatic change in comparison with the present visitation schedule. As pointed out above, when Jessica started school in 1993, the original schedule was revised and the Wednesday overnights were eliminated. Visitation now occurs on Thursdays from 3:30 p.m. to 8:00 p.m. Nevertheless, with this

schedule, defendant usually spends two days per week with Jessica excluding vacation time. Under this revised schedule, defendant is afforded regular contact with Jessica, which was absolutely necessary for defendant to maintain her relationship with Jessica and carry out her important and essential role as a parent with joint custody of the child. This regular visitation is in Jessica's best interest.

The proposed visitation schedule of two weeks in July, two weeks in August, a week at Christmas and Easter vacation according to the school calendar, and other trips sometime during the year in Florida would be unreasonable and would not be in Jessica's best interests. The dramatic change in the amount and quality of time that defendant and Jessica would be able to spend together would undoubtedly cause Jessica to suffer. Moreover, the proposed visitation schedule would not be feasible for defendant due to her financial constraints and familial obligations as plainly appears in the following excerpt of defendant's testimony:

> If I were to go to Florida, I would have some choices, but I don't think any of the choices would work. If I took Savannah to Florida with me, she'd be without her father. Dylan wouldn't be able to come to Florida with us that much because obviously he works and he doesn't get that much time off from work. It would also be very expensive, especially during the holiday times. The airline fares go sky high. If I were to leave Savannah ... in New Jersey and go without her, Savannah would be without her mother. Also, Dylan would have to provide day care for her, which we really can't afford right now, and Dylan can't take off from work to baby-sit her either. Also, me and Dylan would be separated.

Moreover, plaintiff's past failure or unwillingness to cooperate or communicate with defendant in regard to some important decisions involving Jessica, specifically decisions regarding her schooling, her religious training, and her mental and physical well-being, also militate against removing Jessica to Florida.

Finally, and importantly, we are firmly convinced that to permit plaintiff to remove Jessica to Florida would undermine the joint custody arrangement agreed upon by the parties and incorporated in the Final Judgment of Divorce. The joint custody arrangement which provided Jessica with frequent, regular access to both parents and granted both parents equal rights and responsibilities

regarding Jessica would be destroyed. The joint custody arrangement in this case, as in most cases, is premised upon the fact that a child in a unified family setting develops attachments to both parents, and the severance of either of these attachments is contrary to the child's best interests. The removal of Jessica to Florida, approximately 1,200 miles away from New Jersey, will necessarily sever her attachment to defendant. Defendant will no longer be an active decision-maker in Jessica's life. The problems in dealing with Jessica's religious training, education, and medical treatment that existed while plaintiff and defendant lived in close proximity to each other will surely be exacerbated by such a move. In sum, the permanent removal of Jessica to Florida would not be in Jessica's best interest and would undermine her relationship with defendant. Therefore, the trial court's refusal to permit such removal was not a mistaken exercise of discretion.

The decisions relied upon by plaintiff, such as *Holder v. Polanski, supra,* and *Cerminara v. Cerminara,* 286 *N.J.Super.* 448, 669 *A.*2d 837, (App.Div.), *certif. denied,* 144 *N.J.* 376, 676 *A.*2d 1091 (1996), are distinguishable and do not compel a contrary conclusion. For example, in *Holder v. Polanski, supra,* 111 *N.J.* at 354, 544 *A.*2d 852, the Supreme Court ruled that the plaintiff's move with her minor children to Connecticut would not substantially affect the defendant's visitation rights because Connecticut was in relatively close geographical proximity to New Jersey. Similarly, in *Cerminara v. Cerminara, supra,* 286 *N.J.Super.* at 457, 669 *A.*2d 837, we permitted the defendant to permanently relocate with her two minor children to Virginia. There, we found that the plaintiff would be able to maintain substantial contact with his children and that the move was in the children's best interest. *Ibid.* Here, in contrast, Jessica's permanent removal to Florida would not be in her best interest. The distance between Florida and New Jersey is so great that realistically defendant's visitation rights, as well as her relationship with her daughter, would be adversely affected. This greater distance in and of itself may not be sufficient to deny a removal application in some circumstances. Here, however, defendant's limited financial resources, and her

responsibilities to her three-year-old child Savannah and her husband Dylan, will make it virtually impossible for her to travel to Florida. Consequently, the distance between New Jersey and Florida, coupled with defendant's financial and familial obligations to her husband and three-year-old daughter, would substantially interfere with defendant's relationship with Jessica. This determination is reinforced by plaintiff's prior failure to cooperate and communicate with defendant in decisions involving Jessica. Stated simply, the excellent mother-child relationship that exists now between defendant and Jessica would be jeopardized if plaintiff were permitted to remove Jessica to Florida.

The proofs show that any potential visitation plan that could be devised if Jessica lived in Florida would not adequately replace the current relationship that Jessica has with defendant. Any plan would create long periods of time when Jessica would not see her mother. Even if Jessica were to visit defendant during the summer, at Christmas, and at Easter, and if defendant were able to visit Jessica occasionally in Florida, Jessica would not see defendant for substantial periods of time. Contrary to the views of some, telephonic and written communications are not a substitute for personal contact, particularly when dealing with a young child such as Jessica. There cannot be any question that Jessica's relationship with defendant would be detrimentally affected by the proposed move. Jessica cannot shuttle on a regular basis between Florida and New Jersey, and there is no evidence that the parties have sufficient financial means to support such a schedule or even to travel that much themselves. Therefore, the opinion of our dissenting colleague that the matter be remanded for consideration of an alternative visitation schedule, which may have been justified in *Winer v. Winer*, 241 *N.J.Super.* 510, 520–21, 575 *A.*2d 518 (App.Div.1990), is plainly not warranted here.

Whatever advantage plaintiff may obtain for himself and Valerie by moving to Florida does not outweigh the harm that will be caused by breaking up a six-year-old child's security of having both parents, who have been intimately involved in her life,

nearby. Removing Jessica to Florida would certainly be disruptive of the parent-child relationship and would substantially undermine defendant's ability to have a meaningful relationship with her daughter and play an essential parenting role in these important formative years of Jessica's life. *See McMahon v. McMahon*, 256 *N.J.Super.* 524, 534–37, 607 *A.*2d 696 (Ch.Div.1991); *Zwernemann v. Kenny*, 236 *N.J.Super.* 37, 47–48, 563 *A.*2d 1158 (Ch.Div.1988), *aff'd*, 236 *N.J.Super.* 1, 563 *A.*2d 1139 (App.Div.1989).

Accordingly, the order of the Chancery Division, Family Part, that denied plaintiff's motion to permanently remove Jessica to Florida is affirmed substantially for the reasons expressed by Judge Innes in his thorough and thoughtful oral opinion of December 15, 1995.

KLEINER, J.A.D., dissenting.

In a well-crafted opinion, the majority, relying upon *Cooper v. Cooper*, 99 *N.J.* 42, 491 *A.*2d 606 (1984), and *Holder v. Polanski*, 111 *N.J.* 344, 544 *A.*2d 852 (1988), has concluded that the trial judge correctly denied plaintiff's motion seeking to remove his daughter, Jessica, from New Jersey to Sarasota, Florida.

I conclude that the majority has disregarded precepts clearly enunciated by the Supreme Court in *Holder, supra.* As I understand *Holder*, the only proper and appropriate result in this case is a reversal of the trial judge's decision and a remand to the Family Part for further proceedings. I therefore respectfully dissent.

Plaintiff, the primary custodial parent, presented a proposed visitation schedule to the court. The trial judge concluded that the proposed visitation was insufficient and that the lengthy periods between periods of visitation would detrimentally affect the parental relationship that defendant has with her daughter. As noted by the majority, the trial judge's denial was based, in large part, on the inadequacy of plaintiff's proposed visitation schedule:

The obvious problem with the proposed schedule is that the personal contact between parent and child and sister and sister will be lost and with that loss most assuredly will come the loss of the current positive relationship between the mother and daughter.

There are additional problems with the proposed schedule as well. The defendant will be unable to afford the cost of the frequent trips to and from Florida, even if she were permitted to use the arrearages for the cost of the trips. If, as suggested by the plaintiff, the arrearages were used to purchase the airline tickets, this would only cover the cost of the flights for the first year and, as the plaintiff admitted in his testimony, he is not sure how the defendant would afford the cost of travel if the air fare increased significantly.

I do not fault the trial judge's conclusion that plaintiff's proposed plan was inadequate; nor do I fault my colleagues for reaching the same conclusion. Where I part ways with the trial judge, and my colleagues, is in the failure to consider other possible visitation schedules. As noted by the majority, the *Holder* Court stated that:

Maintenance of a reasonable visitations schedule by the noncustodial parent remains a critical concern, but in our mobile society, it may be possible to honor that schedule and still recognize the right of a custodial parent to move.

[*Holder, supra,* 111 *N.J.* at 353, 544 *A.*2d 852.]

Following this language, the majority's conclusion must mean that it was not possible to come up with a reasonable visitation schedule that would still allow plaintiff to move to Florida. This conclusion is not supported by the record.

From the record before us, it appears that the only visitation schedule ever contemplated by the trial court was the original one proposed by plaintiff. There is no evidence that the trial judge ever considered any other visitation arrangements that would permit plaintiff to relocate to Florida, assure that defendant would continue to have meaningful visitation with her daughter, and provide Jessica with meaningful access to her mother, step-father, and step-sister.

Consider the hypothetical where money was not a concern of either party. Clearly, under those circumstances, normal visitation could occur with the child flying to New Jersey by private jet in order to be there for regular visitation. This would have to be acceptable to the court and to the parties. On the other side of

the spectrum would be the instance where the relocation to Florida rendered all visitation impossible. This would clearly be unacceptable to both the court and to the noncustodial parent and would be against the best interest of the child. Most cases, including the present one, fall somewhere in the middle. Our courts should not only examine the adequacy of a newly proposed visitation agreement, they should take affirmative steps to mold, if possible, a visitation arrangement under which all of the competing considerations are satisfied.

This court has held that it is appropriate for a trial court to consider other visitation arrangements when deciding whether to allow a custodial parent to relocate. *See Winer v. Winer*, 241 *N.J.Super.* 510, 575 *A.2d* 518 (App.Div.1990). In *Winer*, the custodial mother sought to relocate for "good faith sincere reasons" to Atlanta, Georgia. The trial court denied the mother's request to relocate based upon the defendant's objection to the visitation plan. The panel in *Winer*, after citing both *Cooper* and *Holder*, stated:

> We agree that if plaintiff were to move it would have an adverse effect on defendant's ability to see his children, since the move would affect the children as they would be unable to see their father as often as they have in the past. However, the loss of visitation may be mitigated under an alternate visitation schedule, and the effect on the children must be weighed against the custodial parent's freedom to move. *Holder*, 111 *N.J.* at 350 [544 *A.2d* 852]. *Here, the trial court did not specifically address the creation of an alternative visitation schedule. Id.* at 353 [544 *A.2d* 852]. Under *Holder* some level of reduction in the amount of visitation *must be deemed acceptable. Id.* at 350–53, 544 *A.2d* 852.
>
> *We remand so that the Family Part may accept proof and address more specifically how an alternative visitation schedule would be so insufficient as to be inimical to the best interests of the children.*
>
> [*Winer, supra*, 241 *N.J.Super.* at 520–21, 575 *A.2d* 518 (emphasis added).]

In *McMahon v. McMahon*, 256 *N.J.Super.* 524, 607 *A.2d* 696 (Ch.Div.1991), the trial judge denied a mother the right to remove her two children to Montana to join her and her second husband, who was a resident of that distant state. Relying upon *Cooper* and *Holder*, the trial judge succinctly summarized the questions which every judge must ask in proceedings of this type:

(1) Does the custodial parent have a sincere, good faith reason for moving from this jurisdiction? If so, then

(2) Will the move be inimical to the best interests of the children?

(3) Will the move adversely affect the visitation rights of the non-custodial parent?

(a) If the move substantially changes the visitation schedule, will the move have prospective advantages for the custodial parent and the children?

(b) Will the children suffer from the move?

(c) Is the custodial parent acting in good faith and not to frustrate the noncustodial parent's visitation rights?

(d) Can a reasonable visitation schedule be maintained for the noncustodial parent?

[*Id.* at 528–29, 607 *A.*2d 696.]

The facts in *McMahon* are somewhat unusual. The parties had entered into a property settlement agreement that provided that "[t]he Parties will share physical custody of the two children of the marriage. . . ." *Id.* at 526, 607 *A.*2d 696. The agreement, which was incorporated in the judgment of divorce, then delineated, in nine sub-paragraphs, with exceptional clarity and specificity, a custody and visitation arrangement.

The parties abided by the agreement from the time of its inception through the date of the trial judge's opinion. Until plaintiff sought to remove the children to Montana and proposed a new visitation schedule, there were no post-judgment proceedings needed to resolve visitation or custody disputes. In all respects, the parents had honored their commitment to each other, and impliedly to their children, to remain intimately involved in their children's lives.

In a thoughtful opinion, the trial judge first found that plaintiff's motives were sincere, in good faith, and not designed to frustrate the non-custodial parent's visitation rights. The court concluded, however, that the adverse affect on defendant's visitation rights was so substantial that it outweighed the benefits that might have awaited plaintiff and her children in Montana. In reaching his conclusion, the trial judge considered the specifics of the contemplated move and the practicalities of creating an alternative visita-

tion schedule. The judge considered the travel time, the cost of travel, the parties' income, the existing support order, and the need to maintain that support. The judge found that, because of the unique circumstances presented, including the financial situation of the parties, the distance involved, and the cost of trips to Montana, the father's visitation would be severely hampered should defendant move to Montana. *Id.* at 532, 607 *A*.2d 696.

In denying plaintiff's request, the judge also considered the best interest of the children, noting that they would miss out on grandparental visitation regularly exercised by both sets of grandparents. Additionally, the judge pointed out that the children had a rich life that was centered in New Jersey.

The judge in *McMahon* engaged in the type of analysis that I think is appropriate. The judge did not just consider the advantages and disadvantages of the particular proposed visitation arrangement, he considered the practicality of visitation *qua* visitation.

I conclude in the present case that the trial court erred in simply rejecting plaintiff's proposed plan without first examining other plans, either judicially created or created with the help of defendant. Therefore, I believe that a remand is mandated. My colleagues' affirmance unnecessarily renders plaintiff a hostage in New Jersey. The majority opinion ignores the fact that we live in an increasingly complex, mobile society where fluidity of movement is often a corollary of employability.

When plaintiff filed his motion seeking leave to remove Jessica from New Jersey and to establish a new visitation schedule, defendant was $1,400 in arrears on her child support. Plaintiff certified that, until he filed his motion seeking removal, defendant had not paid any child support for eighteen months. Once plaintiff filed his motion and defendant filed a cross-motion for custody, defendant resumed her current support obligation. Additionally, although the support order was initially $40 per week, in a prior proceeding to enforce the support order, defendant's support obligation was reduced from $40 a week to $20 per week. She

nonetheless continued to be in arrears. The majority has correctly reviewed defendant's current economic status. Defendant, as of the date of trial was unemployed. She had the responsibility of raising her second child, then twenty months of age. Realistically, she will not be able to continue to meet any current support order or to pay her arrearage. Plaintiff recognized these facts and, as part of his relocation proposal, he indicated a willingness to forego arrearage enforcement and to forego receipt of current or future support.

The trial judge noted that plaintiff had offered to forego the payment of arrearages so that defendant would have additional funds with which to purchase airline tickets. The judge, however, rejected this idea because the arrearages would only cover the first year's tickets. The judge could have taken this idea and expanded it. He could have explored the idea of having plaintiff pay a portion of defendant's air fare. He could also have considered increasing the time that Jessica would spend in New Jersey, mitigating the cost of air fare.

Plaintiff has offered his current wife's health needs as one reason why he should be allowed to move to Florida. Plaintiff should likewise offer evidence of his current wife's income, or prospective income, as a factor to be used in assessing the economic issues entailed in a visitation plan which will include travel by air between Florida and New Jersey. Although plaintiff's present wife, a psychologist, has no legal obligation to assist financially in transportation expenses, the judge could have considered whether her prospective earning capacity as a psychologist in Florida should be a factor in the equation. If plaintiff's present wife would benefit from the proposed move, isn't it fair to include a portion of her income when crafting a visitation schedule designed to protect the noncustodial parent's right to meaningful visitation? I think so.

In considering other possible visitation arrangements, the trial judge could have considered any of these factors. If the judge thought that the amount of visitation time was insufficient, he

could have increased it. By way of example, consider the following proposals: eight weeks of uninterrupted summer visits; two weeks during the Christmas recess; ten days during the school spring recess; and at least two visits by defendant in Florida, presumably for one week during each visit.

The majority has stressed that the visitation plan offered by plaintiff is inadequate. Among the reasons cited is the fact that defendant has substantial parenting responsibilities with Jessica's half-sister, Savannah. According to defendant, if she had to travel to Florida to visit Jessica, she would have no one to watch Savannah, as Savannah's father, Dylan, is employed at two separate jobs. Defendant, however, testified about the close relationship that she maintains with her own sister, brother, and the member's of Dylan's family. As noted by the majority:

> Defendant's sister has two children and her brother has two children. On Dylan's side of the family there are a lot of cousins. Dylan also has a younger brother of whom Jessica is very fond. In addition, defendant and Dylan have relatives close to Jessica's age with whom she enjoys playing. The majority of Dylan's family lives in New Jersey, and he and Savannah see them often.

From those facts, it is fair to infer that, if defendant did travel to Florida to visit Jessica, there are a number of responsible relatives who, if asked, would or could assist in caring for Savannah.

I also note that defendant's parents reside in Florida, near the area where plaintiff intends to establish a new residence. The record demonstrates that defendant would be a welcome guest at her parent's home, with no additional expense, while visiting Jessica in Florida.

It seems abundantly clear to me that the trial judge should have considered other possible visitation arrangements. By simply rejecting plaintiff's proposed visitation plan, and by not *sua sponte* considering other possible plans, the trial judge committed error. The proper disposition of this matter would require a reversal of the order denying plaintiff's motion and a remand of the matter to the trial court for further proceedings to consider whether "in our mobile society, it may be possible to honor [a reasonable visitation

schedule] and still recognize the right of a custodial parent to move." *See Holder, supra,* 111 *N.J.* at 353, 544 *A.*2d 852.

I therefore respectfully dissent.